**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **AHMED CHHAB, KATHRYN SHRADER, LANCE FELDHUN, MICHAEL RELLA, VINCENT ANTHONY BORELAND, and ADRIANNE BENZION** on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>**DARDEN RESTAURANTS, INC., GMRI, INC., CAPITAL GRILLE HOLDINGS, INC. d/b/a THE CAPITAL GRILLE, and RARE HOSPITALITY INTERNATIONAL, INC.,**<br><br>Defendants. | 11 Civ. 8345 (NRB)<br>(JLC) |

**MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION**
**PURSUANT TO THE FAIR LABOR STANDARDS ACT, FOR COURT-AUTHORIZED**
**NOTICE TO SIMILARLY SITUATED PERSONS, AND FOR EXPEDITED DISCOVERY.**

**FITAPELLI & SCHAFFER, LLP**
Joseph A. Fitapelli
Brian S. Schaffer
Eric J. Gitig
475 Park Avenue South, 12th Floor
New York, New York 10016
Phone: (212) 300-0375
Fax: (212) 481-1333

*Attorneys for Plaintiff and*
*the putative class*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................iv

BACKGROUND ...........................................................................................................1

I.     PROCEDURAL HISTORY.................................................................................1

II.    STATEMENT OF FACTS ...............................................................................2

    A.   <u>Defendants.</u> ...............................................................................................2

        1.   Defendants Centrally Control, Train, and Monitor Employees At All TCG Locations. ....................................................................................2

        2.   TCG Provides Extensive Standardized Training To New Tipped Employees And Managers .........................................................................4

    B.   <u>Plaintiffs</u>.................................................................................................6

III.   NATURE OF THE CLAIMS

    A.   <u>Defendants Pay All Tipped Employees Less Than The Full Minimum Wage.</u>..............6

        1.   Defendants Require Tipped Employees To Spend A Substantial Amount Of Time Performing Non-Tip Producing "Side Work." ...........................................7

            a.   *Pre-November 2011 "Side Work."* ...............................................9

            b.   *Post November 2011 "Universal Side Work."* ...........................................11

        2.   Defendants Required Tipped Employees To Share Tips With Employees Who Did Not Customarily And Regularly Receive Tips.........................................13

    B.   <u>Defendants Have Not Compensated Tipped Employees For All Hours Worked.</u> ........14

    C.   <u>Defendants Have Denied Tipped Employees Overtime Compensation.</u> .....................15

ARGUMENT ...........................................................................................................16

I.     CONDITIONAL CERTIFICATION OF THE NATIONWIDE FLSA COLLECTIVE IS APPROPRIATE HERE.........................................................................16

    A.   <u>The Two-Step Certification Process For FLSA Collective Actions</u>...............................17

B.   Plaintiffs have Made the Required Showing that All Tipped Employees are
     Similarly Situated with Respect to Their FLSA Claims. ............................................ 18

     1.   A Nationwide Collective Is Appropriate ........................................................... 21

II.   COURT-AUTHORIZED NOTICE IS APPROPRIATE IN THIS CASE. ................ 22

III.   A THREE YEAR NOTICE PERIOD IS APPROPRIATE. ....................................... 23

IV.   EXPEDITED DISCLOSURE OF NAMES AND CONTACT INFORMATION ..... 24

V.   EQUITABLE TOLLING ............................................................................................ 24

CONCLUSION ................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>................................................................................................<u>Page Number</u>

*In re Deloitte & Touche, LLP Overtime Litig.*,
   No. 11 Civ. 2461 (RMB)(THK), 2012 WL 340114 (S.D.N.Y. Jan. 17, 2012)....................22, 24

*Dole v. Bishop,* 740 F. Supp. 1221 (S.D. Miss. 1990) ....................................................................8

*Driver v. AppleIllinois, LLC*,
   No. 06 Civ. 6149 (GSB), 2012 WL 3716482 (N.D. Ill. Aug. 27, 2012) .......................... *passim*

*Duarte v. Tri-State Physical Medicine  Rehabilitation, P.C.*,
   No. 11 Civ. 3765 (NRB), 2012 WL 2847741 (S.D.N.Y. July 11, 2012)...................................17

*Fast v. Applebee's International, Inc.*, 638 F.3d 872 (8th Cir. 2011) ...................................... 8, 20

*Fast v. Applebee's Intern., Inc.*,
   No. 06 Civ. 4146 (NKL), 2009 WL 2391921 (W.D.Mo. Aug. 3, 2009) ............................ 19-20

*Ferreira v. Modell's Sporting Goods, Inc.*,
   No. 11 Civ. 2395 (DAB), 2012 WL 2952922 (S.D.N.Y. July 16, 2012) .......................... 18, 21

*Guzelgurgenli v. Prime Time Specials Inc.*,
   No. 11 Civ. 4549 (ADS)(WDW), 2012 WL 3264314 (E.D.N.Y. Aug. 8, 2012) .......................24

*Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)................................................. 22

*Karic v. Major Automotive Companies, Inc.*,
   799 F. Supp. 2d 219 (E.D.N.Y. 2011) ................................................................................ 24

*Morris v. Lettire Construction, Corp.*,
   No. 12 Civ. 0043 (NRB), 2012 WL 4320462 (S.D.N.Y. September 18, 2012) ............... *passim*

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir.  2010) ................................................... 17, 18, 22

*In re Penthouse Exec. Club Compensation Liti.*,
   No. 10 Civ. 1145 (NRB) 2010 WL 4340255 (S.D.N.Y. Oct. 27, 2010)  .................... 17, 18, 24

*Pippins v. KPMG LLP*,
   No. 11 Civ. 0377 (CM)(JLC), 2012 WL 19379 (S.D.N.Y Jan. 3, 2012).................... 17, 19, 22

*Raniere v. Citigroup Inc.*, 827 F. Supp. 2d 294 (S.D.N.Y. 2011) .................................. 18, 19, 24

*Salomon v. Adderley Industries, Inc.*, 847 F. Supp. 2d 561 (S.D.N.Y. 2012) ............................. 18

*Stevens v. HMSHost Corp.*,
    No. 10 Civ. 3571 (ILG) (VVP), 2012 WL 4801784 (E.D.N.Y. Oct. 10, 2012) ...................... 21

*Shajan v. Barolo Ltd.*,
    No. 10 Civ. 1385 (CM), 2010 WL 2218095 (S.D.N.Y. June 2, 2010)................................... 17

*Shahriar v. Smith & Wollensky Restaurant Group, Inc.*, 659 F.3d 234 (2d Cir. 2011)................ 7

*Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F.Supp.2d 449 (S.D.N.Y.2011) ....................... 23

*Winfield v. Citibank, N.A.*, 843 F. Supp. 3d 397 (S.D.N.Y. Feb. 9, 2012) .................................. 21

*Yahraes v. Rest. Associates Events Corp.*,
    No. 10 Civ. 935 (SLT), 2011 WL 844963 (E.D.N.Y. March 8, 2011) ......................................25

**Statutes** ................................................................................................................**Page Number**

29 U.S.C. § 201 *et seq.* ("FLSA") ...................................................................................... *passim*

29 U.S.C. § 203(m) ...................................................................................................................6,13

29 U.S.C. § 207(a)(1) ...................................................................................................................15

29 U.S.C. § 216(b) ..................................................................................................................*passim*

29 U.S.C. § 255 ...........................................................................................................................23

**Rules & Regulations**..........................................................................................**Page Number**

29 C.F.R. § 516.59(b) ...................................................................................................................7

29 C.F.R. § 531.56(e).....................................................................................................................7

**Additional Authorities** ....................................................................................**Page Number**

U.S. Department of Labor 1988 Field Operations Handbook § 30d00(e)...................................... 8

## PRELIMINARY STATEMENT

The nationwide chain of Capital Grille restaurants[1] (hereinafter "TCG") unlawfully denies all of its Servers and Bartenders (hereinafter "Tipped Employees") the proper minimum wage and overtime pay, in violation of the Fair Labor Standards Act ("FLSA"). TCG has improperly availed itself of the tip credit minimum wage and failed to properly record all hours worked by its Tipped Employees. In that regard, TCGs' uniform compensation policies and timekeeping practices, coupled with the company's aggressive attempts to reduce labor costs, foster an unavoidable environment where all Tipped Employees are required to: (1) perform a substantial amount of non-tip producing "side work" while being paid less than the full minimum wage; (2) share tips with non-tip eligible positions; and (3) work off the clock without pay.

Through this motion, Plaintiffs seek to protect the rights of themselves and the rights of Tipped Employees nationwide by sending them early Court-approved notice of this action and allow potential opt-ins to join this action and attempt to recover their unpaid wages. Through TCGs' public filings, the testimony of executives and managers, and the testimony and declarations of Plaintiffs and Opt-Ins, Plaintiffs exceed their low burden on this motion and demonstrate that Defendants subjected all Tipped Employees to the same unlawful policies.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint on November 17, 2011, and an Amended Complaint on March 1, 2012, alleging that Defendants' FLSA violations were willful and perpetrated through a common policy or plan with respect to all Tipped Employees at all forty-seven TCG restaurants

---

1    Defendants refer collectively the restaurants as "The Capital Grille" or "TCG."

nationwide. *See* **Exhibit ("Ex.") A**, Amended Complaint.[2]  Defendants joined issue on April 30, 2012. Thereafter, the parties engaged in limited discovery regarding common policies. To date, forty-five tipped employees representing eleven locations[3] have opted into the instant action and allege the same policies and practices have been in effect nationwide. Moreover, the former Vice President of Operations, head of Human Resources and Managing Partners have offered testimony illustrating TCG subjected all Tipped Employees to common nationwide policies.

## II.   STATEMENT OF FACTS

### A.   <u>Defendants</u>

Darden Restaurants Inc. ("Darden") is a publicly traded company that controls and operates over 1,900 well-known chain restaurants nationwide including, Red Lobster, The Olive Garden, Bahama Breeze, and Longhorn Steakhouse, and employs over 180,000 employees. Defendants own, operate and control a nationwide chain of forty-seven TCG restaurants.[4] Throughout the "FLSA Period" (November 17, 2008 to the present), Defendants have employed thousands of Tipped Employees, who were denied minimum wage and overtime compensation as a result of Defendants' common violations of the FLSA.

#### 1.   Defendants Centrally Control, Train, and Monitor Employees At All TCG Locations.

From its nerve center located at 1000 Darden Center Drive in Orlando, Florida, TCG maintains control over its forty-seven restaurant locations to ensure uniformity.[5] TCG utilizes a structured corporate hierarchy whereby a Managing Partner ("MP") manages each individual restaurant, and MPs report to one of seven regional Directors of Operations ("DO"), who in turn

---

2    All Exhibits are attached to the Declaration of Joseph A. Fitapelli ("Fitapelli Decl.").
3    42nd Street, New York; 51st Street, New York; Charlotte, North Carolina; Fort Lauderdale, Florida; Indianapolis, Indiana; McLean, Virginia; Orlando, Florida; Pittsburg, Pennsylvania; Phoenix, Arizona; Tampa, Florida; and Wall Street, New York.
4    **Ex. B**, Deposition Transcript of Brian Foye ("Foye Tr.") at 7:23-24.
5    *See Id.* at 182:24-183:13.

report to a single Senior Vice President of Operations."[6]   Until in or around August 2012, the position of Senior Vice President of Operations was occupied by Brian Foye, who was "in charge of day-to-day operations of the restaurants."[7]   Mr. Foye received weekly reports from DOs, approved training materials, assisted in the opening of thirty-eight TCGs, and hired the MPs to manage the restaurants.[8]

Individual TCG locations are micromanaged down to the smallest detail by exhaustive company-wide policies and training programs. As stated by Mr. Foye: "There are virtually specifications for everything that we do."[9]   Undeniably, TCGs' business model requires such uniformity, as Darden explains in its Form 10-K:

> "**Restaurants are visited regularly by all levels of supervision to help ensure strict adherence to all aspects of our standards.** Our Learning Center of Excellence in partnership with each brand's head of training, together with senior operations executives, are responsible for developing and maintaining our operations training programs. These efforts include a 12 to 15-week training program for management trainees (8 to 9 weeks in the case of internal promotions) and continuing development programs for managers, supervisors and directors."[10]

Moreover, TCG is in constant communication with all its locations as the same systems and programs are used to manage information related to: labor, HR, menu specifications, training materials, financial and payroll information. [11] Accordingly, all TCG locations utilize: DASH (Darden Application for Service and Hospitality), TCGs' proprietary point of sale and timekeeping system; DiSH (Darden Information Super Highway) providing access to payroll information and various publications; LMS (Labor Management System) scheduling system; and

---

6    *See Id.* at 20:10-24; *See also* **Ex. C**, July 2012 Form 10-K, page 7.
7    **Ex B,** Foye Tr. at 13:25-14:16.
8    *Id*. at 16:17-17:14, 225:13-19.
9    *Id*. at 134:23-24.
10   **Ex. C**, July 2012 Form 10-K, page 7 (emphasis added).
11   **Ex. C**, July 2012 Form 10-K, page 9; **Ex. B**, Foye Tr. at 234:20-235:19; *See also* **Ex. D**, The CG Ticker Tape.

the Par Pull system, used to measure food preparation requirements.

> ### 2. TCG Provides Extensive Standardized Training To New Tipped Employees And Managers.

TCG utilizes a "highly structured training program to open new restaurants, including deploying training teams experienced in all aspects of restaurant operations."[12] Initial training of Tipped Employees is largely carried out by certified trainers, "hourly employee[s] who [are] good at doing [their] job and ha[ve] been trained to follow a training process."[13]

Considered "a gateway to management," certified trainers are responsible for passing on the policies carried out at TCG.[14] Certified trainers utilize a set curriculum designed by the corporate training department.[15] A certified trainer must "become knowledgeable and demonstrate knowledge in both the content of their work and the training materials that would support that work, and the process for training a new person to do so."[16] Prior to certification, management assesses a trainers' knowledge through various tests on product knowledge and procedures, including point of sale systems.[17]

During the initial training period for a new restaurant, TCG draws certified trainers and managers from various existing locations to indoctrinate the new location in TCGs' policy, procedure and philosophy.[18] As the individual in charge of operations, Mr. Foye participated in training meetings with the management team, and reviewed and approved lists of certified trainers who would be assisting with the openings.[19] Following initial training, Mr. Foye then

---

12    **Ex. C**, July 2012 Form 10-K, page 7.
13    **Ex. E**, Deposition Transcript of Thomas Gathers ("Gathers Tr.") at 56:8-11.
14    **Ex. B**, Foye Tr. at 26:21-23.
15    *Id*. at 27:1-25.
16    **Ex. E,** Gathers Tr. at 57:11-24.
17    *Id.* at 58:15-59:5.
18    *See, e.g.,* **Ex. B**, Foye Tr. at 36:2-19; **Ex. F**, Deposition Transcript of Jill Dickstein ("Dickstein Tr.") at 252:23-253:16; **Ex. G**, Deposition Transcript of Melissa Trumbull ("Trumbull Tr.") at 38:24-39:3, 43:7-23, 46:4-6; **Ex. H**, Deposition Transcript of Armin Ahrabinejad ("Ahrabinejad Tr.") at 59:5-14.
19    **Ex. B**, Foye Tr. at 21:22-25, 24:1-25:4.

remained at the location to observe two to three days of mock service.[20]  As such, Defendants carefully monitored each new restaurant opening from the corporate level.

During orientation and training, new employees receive instruction on every aspect of their employment, including service, "side work", and "the point of sale system [DASH]."[21]  Employees are supplied with standardized training manuals including TCGs' Server/Bartender Manual, team member handbooks and payroll guides.[22] TCGs' approach to the opening of a new restaurant exemplifies their committed approach to consistency and uniformity throughout their brand. Moreover, TCGs' training procedure for new restaurants essentially creates a photocopy of their existing restaurants, implementing the same policies and procedures that were already in effect.

Similarly, new managers are trained during a manager-in-training ("MIT") process.[23] This training generally takes place at one, or several, different TCG locations other than the restaurant to which a manager will be assigned.[24] Managers are trained "by the managing partner and the management team in that restaurant on all aspects of operating a Capital Grille."[25]  TCG further requires all new managers to complete a week of standardized training at the corporate support center in Orlando.[26] New MPs also attend training at Darden University in Orlando.[27] The fact that "[e]very manager is, at some point, trained in an existing Capital Grille," ensures that each restaurant is adhering to the same policies and running their restaurants the same way.[28] Notwithstanding, a MPs' training, "**Managers cannot change policy**" at TCG.[29]

---

20    **Ex. B,** Foye Tr. at 56:9-23.
21    **Ex. E,** Gathers Tr. at 66:1-17, 73:23-74:7; **Ex. B,** Foye Tr. at 51:3-52:14, 61:25-62:6, 79:8-17.
22    *See e.g.,* **Ex. B,** Foye Tr. at 43:6-19; **Ex. E,** Gathers Tr. at 52:11-22.
23    **Ex. B,** Foye Tr. at 52:25-53:15; **Ex. E,** Gathers Tr. at 104:21-22.
24    *See, e.g.,* **Ex. F,** Dickstein Tr. at 11:8-22; **Ex. I,** Deposition Transcript of Randy Cook ("Cook Tr.") at 26:10-23; **Ex. J,** Deposition Transcript of James Zemlock ("Zemlock Tr."), at 29:22-30:3.
25    **Ex. E,** Gathers Tr. at 104:4-15.
26    **Ex. B,** Foye Tr. at 54:6-9.
27    **Ex. E,** Gathers Tr. at 109:21-112:21.
28    *Id.* at 90:12-22.
29    **Ex. B,** Foye Tr. at 165:16-18 (emphasis added).

Moreover, TCGs' "cookie-cutter" approach to brand management, allows management and Tipped Employees to seamlessly transition from location to location without further training with respect to policies.[30]  Many of the Plaintiffs and MPs who appeared for depositions reported that they worked at multiple TCGs.[31]  Moreover, Tipped Employees who worked at different locations testified that the policies were essentially identical at each TCG they worked, solidifying the fact that Defendants apply the same policies at TCG restaurants nationwide.[32]

### B.   Plaintiffs

Plaintiffs have all worked as servers and/or bartenders at eleven of the forty-seven TCG restaurants during the FLSA Period, with many Plaintiffs working at multiple locations.  At all times, Tipped Employees have been subjected to the same company-wide policies.[33]  As a result, every individual who has worked as a Tipped Employee at TCG during the FLSA Period has been similarly affected by Defendants' standardized wage and hour policies.

## III.   NATURE OF THE CLAIMS.

### A.   Defendants Pay Tipped Employees Less Than Full Minimum Wage.

Defendants pay tipped employee less than the full statutory minimum hourly wage by unlawfully taking advantage of the federal "tip credit" that is only available to employers who satisfy specific criteria.[34]  *See* 29 U.S.C. § 203(m).  Defendants' use of the tip credit, however, has been unlawful, as they have uniformly required tipped employees to: (1) perform a substantial amount of non-tip producing duties in excess of twenty percent of their shift; *See*

---

30      *See, e.g.,* **Ex. B**, Foye Tr. at 225:20-226:5.
31      *See* **Ex. K**, Deposition Transcript of Ahmed Chhab ("Chhab Tr.") at 128:9-20; **Ex. L**, Deposition Transcript of DuJuan White ("White Tr.") at 21:19-22; **Ex. M**, Deposition Transcript of Crystal Beng ("Beng Tr.") at 34:10-18; **Ex. N**, Deposition Transcript of Tasiya Oliver ("Oliver Tr.") at 10:21-25, 18:1-9; **Ex. O**, Deposition Transcript of Haley Duke ("Duke Tr.") at 133:1-8, 134:1-8; **Ex. F**, Dickstein Tr. at 26:20-27:9, 32:11-20; **Ex. H**, Ahrabinejad Tr. at 21:9-24:4.
32      *See, e.g.,* **Ex. K**, Chhab Tr. at 127:15-17; **Ex. L**, White Tr. at 43:22-44:15; **Ex. M**, Beng Tr. at 49:17-23; **Ex. N**, Oliver Tr. at 102:22-24.
33      *Id.*
34      **Ex. B**, Foye Tr. at 87:11-16.

*Driver v. AppleIllinois, LLC*, No. 06 Civ. 6149, 2012 WL 3716482, at *2 (N.D. Ill. Aug. 27, 2012) ("An employer may take a tip credit only for hours worked by [an] employee in an occupation in which [he] qualifies as a tipped employee."); and (2) distribute tips to ineligible employees at most TGC locations; *See Shahriar v. Smith & Wollensky*, 659 F.3d 234, 240 (2d Cir. 2011)(finding that "expediters," "dishwashers," "silver polishers," and "coffee makers" were not tip eligible employees under FLSA or New York Labor Law 196-d if they did not provide direct customer service). Accordingly, Tipped Employees are entitled to the full minimum wage.

### 1.    Defendants Require Tipped Employees To Spend A Substantial Amount Of Time Performing Non-Tip Producing "Side Work."

An employer may take the tip credit "only for hours worked by [an] employee in an occupation in which [he] qualifies as a 'tipped employee.'" 29 C.F.R. § 516.59(b).  Sometimes, an "employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter[,]" 29 CFR § 531.56(e), or where a waiter spends part of her time performing non-tipped work. Dr*iver*, 2012 WL 3716482, at *21-22.  The employee holding a dual job "is a tipped employee only with respect to his employment as a waiter" and can be paid the tip credit only for that period of time that he worked as a waiter. *Id.*  Where an employee is required to engage in activities that are not "directed toward producing tips," the temporal and qualitative nature of the tasks is crucial in determining whether such work may be paid at the tip credit rate.

Where, as here, the duties in question are "unrelated" to the tip producing work, the time spent on these duties can never be paid at the tip credit minimum wage, irrespective of the amount of time that the server spends doing the work. *See Id.* ("the tip credit may not be taken for time spent in duties unrelated to the tipped occupation.") Examples of duties that are unrelated to tipped work are silver polishing, cleaning bathrooms, preparing food, laying tables,

cleaning up and preparing the restaurant for business. *Id.* (*citing Dole v. Bishop*, 740 F. Supp. 1221, 1228 (S.D. Miss. 1990)).

Even when an employee is performing non-tipped duties that are related to her tip producing work, if the employer requires a tipped employee to "*spend a substantial amount of time (in excess of 20 percent)* performing general preparation work or maintenance, no tip credit make be taken for the time spent in such duties.*" Driver*, 2012 WL 3716482, at *2 (quoting and citing *U.S. Dept. of Labor Field Operations Handbook Ch. 30d00(e)* (Rev. 563) (Dec. 9, 1988) (emphasis in original) (available at http://www.dol.gov));  *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 881 (8th Cir. Mo. 2011)("The regulation places a temporal limit on the amount of related nontipped work an employee can do and still be considered to be performing a tipped occupation. The DOL has used a twenty percent threshold to delineate the line between substantial and nonsubstantial work … ").

An employer must keep track of employees' time spent performing "unrelated" tasks and time spent on related tasks that constitute general preparation work or maintenance, to ensure proper compliance with the minimum wage. [35] Dr*iver*, 2012 WL 3716482, at *27 n. 13; 29 C.F.R. §516.28(a); *Fast*, 638 F.3d at 882 ("If [Employer] did not maintain sufficient records from which the employees can differentiate between when they performed tipped duties and when they performed related but nontip-producing duties within the meaning of the dual jobs regulation, then the employees can use the relaxed *Mt. Clemens* standard by produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.")

---

[35]      *See* **Ex. B,** Foye Tr. at 88:13-25; **Ex. F**, Dickstein Tr. at 190:14-191:5; **Ex. J**, Zemlock Tr. at 214:2-19; **Ex. P**, Deposition of James Hamilton ("Hamilton Tr.") at 117:19-119:4.

TCG requires employees to perform a substantial amount of "side work." All Tipped Employees carry a card as "part of [their] uniform" which states that each person, each day will have 1-5 side jobs involving cleaning, sanitizing, maintenance, and/or upkeep.[36] The purpose of which is to keep the restaurants, "in great shape and prevent a 'crash' cleaning."[37] No mention is made of guest service. Further, even if TGC can establish that the "side work" was somehow considered "related" to the servers tip producing duties, the "side work" consumed well over twenty percent of Plaintiffs' working time. For both of the reasons, the "side work" could not have been paid at the tip credit minimum wage. *Driver*, 2012 WL 3716482, at *2 ("[Employer] required many tipped employees to spend 'a substantial amount of time (in excess of 20 percent)' performing sidework duties that were not tip producing.")

Defendants have knowledge of the "twenty percent rule"[38] and the ability to record the time spent by Tipped Employees performing "side work."[39] However, Defendants inexplicably failed to accurately record Tipped Employees' time. Rather, Defendants illegally paid Tipped Employees the tip credit minimum wage for all hours worked.[40]

### a.   *Pre- November 2011 "Side Work."*

Prior to November 2011, TCG restaurants posted a general "side work" list for Tipped Employees.[41] During this period, the core elements of "side work" were the same across the chain, as evidenced by both Defendants' materials and the parties' deposition testimony.[42] Moreover, any

---

36    **Ex. Q,** Server/Bartender Manual Excerpts, page D0165063.
37    *Id*.
38    **Ex. R,** Tip Share Program Rollout Program Guide, page 10.
39    **Ex. S,** Mark Wirnowski ("Wirnowski Tr.") at 20:8-24.
40    **Ex. B,** Foye Tr. at 87:11-13.
41    *See* **Ex. T**, NYC-42[nd] Street Side Work Guidelines; **Ex. U**, NYC-51[st] Street Side Work Guidelines; **Ex. V**, NYC-Wall Street Side Work Guidelines; **Ex. W**, Tampa, Florida Side Work Guidelines; **Ex. X**, Orlando, Florida Side Work Guidelines; **Ex. Y**, Indianapolis, Indiana Side Work Guidelines; **Ex. Z**, Charlotte, North Carolina Side Work Guidelines; **Ex. AA**, Phoenix, Arizona Side Work Guidelines.
42    *See* FN41, *supra*; *see also, e.g.,* **Ex. B**, Foye Tr. at 87:4-8; **Ex. K**, Chhab Tr. at 128:9:23; **Ex. L**, White Tr. at 135:24-138:7; **Ex. M**, Beng Tr. at 42:10-15; **Ex. N**, Oliver Tr. at 86:16-19; , ¶ 6; **Ex. BB**, Declaration of Amy Smith ("Smith Decl."), ¶ 13.

changes made to "side work" policies were made across the chain to all TCG restaurants.[43]

Prior to the start of service, Tipped Employees were required to attend a pre-shift meeting, fold napkins to be used by the entire restaurant, and polish glasses and silverware in their section.[44] Thereafter, Defendants assigned Tipped Employees preparatory tasks, by station. Each station consisted of opening and closing "side work" assignments that involved not only maintenance, but the mass production of traditional "back of the house" items. Such items included, prepping bins of lemons, which required cutting and wrapping lemons in netting and tying up the wraps,[45] and prepping trays of butter. Depending on the date, butter preparation consisted of either placing whipped butter in ramekins or using a hot knife to cut bricks of butter into triangles and placing garnishes on each butter slice.[46] In order to determine the amount of lemons and butters to produce, Defendants' used the Par-Pull System.[47] The materials and instructions for preparation of these items were provided by Defendants.[48]

Aside from the preparation of lemons and butters, opening "side work" for tipped employees included, but was not limited to: to-go bags, which consisted of having the chef sign note cards, cutting twine, and tying the note cards to the to-go bags prior to service;[49] setting up the coffee station, which consisted of stocking sugar packets, beans, filters, swizzle sticks, cups and spoons, brewing coffee and tea, and filling milk creamers and loose tea containers;[50] polishing

---

43    **Ex. CC,** Email related to butter specifications.
44    *See, e.g.,* **Ex. K**, Chhab Tr. at 155:2-7; **Ex. L**, White Tr. at 152:9-18; **Ex. M**, Beng Tr. at 122:5-21; **Ex. DD**, Deposition Transcript of Amy Mitchell ("Mitchell Tr.") at 133:17-23, 135:2-11.
45    *See, e.g.,* **Ex. K**, Chhab Tr. at 184:16-23; **Ex. L**, White Tr. at 134:11-135:3; **Ex. EE**, Michael Rella ("Rella Tr.") at 130:15-131:15; **Ex. DD**, Mitchell Tr. at 132:18-133:1; *see also* **Ex. B**, Foye Tr. at 135:2-23.
46    *See, e.g.,* **Ex. L**, White Tr. at 147:1-17; **Ex. N**, Oliver Tr. at 55:21-56:9; **Ex. FF**, Anthony Boreland ("Boreland Tr.") at 117:20-118:1; **Ex. GG**, Adriane Benzion ("Benzion Tr.") at 62:11-25; **Ex. EE**, Rella Tr. at 124:8-125:12; **Ex. DD**, Mitchell Tr. at 133:2-6.
47    *See, e.g.,* **Ex. B**, Foye Tr. at 99:24-100:1.
48    *See, e.g.,* **Ex. B**, Foye Tr. at 82:9-13, 135:2-23.
49    *See, e.g.* **Ex. EE**, Rella Tr. at 159:4-22; **Ex. L**, White Tr. at 151:2-19; **Ex. DD**, Mitchell Tr. at 137:20-138:3; **Ex. HH**, Kathryn Shrader ("Shrader Tr.") at 81:12-82:3; *see also* **Ex. B**, Foye Tr. at 136:7-19.
50    *See, e.g.,* **Ex. FF**, Boreland Tr. at 122:7-19; **Ex. EE,** Rella Tr. at 151:10-152:21; **Ex. DD**, Mitchell Tr. at 136:9-17.

and stocking glasses, flatware, and silverware;[51] filling ice bins;[52] and general cleaning and maintenance such as checking for gum under the tables.[53] These jobs were completed by Tipped Employees at the start of every shift, and if a Tipped Employee was assigned to an "easier" preparatory task they would be required to assist in more time consuming duties.[54]

At the conclusion of a shift, closing "side work" included, but was not limited to: running racks of water and wine glasses though the dishwasher and polishing the glasses;[55] running racks of steak knives through the dishwasher, taking a cloth and polishing them;[56] creating "setups" which consisted of washing silverware, polishing silverware, and placing polished silverware into a glass;[57] cleaning and restocking;[58] and cleaning and breaking down the coffee station which consisted of, cleaning the coffee machines, restocking coffee beans, tea and other items.[59] The amount of time Tipped Employees spent performing closing "side work" was "significant," as they were not allowed to leave until everything was set up for the following meal service.[60]

**b.**      *Post November 2011 "Universal Side Work."*

In November 2011, Defendants, presumably realizing that their pay practices with regard to "side work" violated the law, rolled out two company-wide "operational changes" known as the "Tip Share Program Rollout Guide" (hereinafter "Tip Share Program") and "Universal Side

---

51      *See, e.g.,* **Ex. K**, Chhab Tr. at 188:21-189:21; **Ex. N**, Oliver Tr. at 55:24-25; **Ex. GG**, Benzion Tr. at 69:11-20; **Ex. II**, Deposition of Lance Feldhun at 143:17-25.
52      *See, e.g.,* **Ex. FF**, Boreland Tr. at 124:5-22; **Ex. HH** Shrader Tr. at 87:1-21; **Ex. EE**, Rella Tr. at 153:12-154:18.
53      *See, e.g.,* **Ex. DD**, Mitchell Tr. at 134:23-135:2; **Ex. J**, Zemlock Tr. at 198:18-24.
54      *See, e.g.,* **Ex. K**, Chhab Tr. at 131:9-17; **Ex. L**, White Tr. at 154:8-21; **Ex. M**, Beng Tr. at 50:24-51:1; **Ex. N**, Oliver Tr. at 56:16-18.
55      *See, e.g.,* **Ex. HH**, Shrader Tr. at 95:2-9; **Ex. EE**, Rella Tr. at 160:11-161:18.
56      *See,* **Ex.K**, Chhab Tr. at 172:4-173:21; **Ex. HH**, Shrader Tr. at 97:12-98:24; **Ex. EE**, Rella Tr. at 155:23-157:8.
57      *See, e.g.,* **Ex. HH**, Shrader Tr. at 101:4-21; **Ex. L,** White Tr. at 183:5-18; **Ex. N**, Oliver Tr. at 69:9-16.
58      *See, e.g.,* **Ex. L**, White Tr. at 174:8-17
59      *See, e.g.,* **Ex. FF**, Boreland Tr. at 132:12-22; **Ex. HH**, Shrader Tr. at 93:7-19.
60      **Ex M**, Beng Tr. at 55:15-23.

Work."[61] The Universal Side Work policy essentially memorialized TGC "side work" policies, with minor changes, such as now assigning lemons and butters to the kitchen and assigning new tasks to the servers. Thus, the general quantity of "side work" remained virtually unchanged.[62]

Defendants attempted to shield themselves from liability by stating in the Tip Share Program that managers should not require Tipped Employees to spend more than twenty percent of their time on tasks "unrelated to providing direct service to our guests."[63] The Tip Share Program cites examples of tasks unrelated to service as: rolling/polishing silverware, glassware, etc., filling ice stations, stocking plates glasses or side stations and cutting fruit/prepping food.[64] The document continues to state that these duties "would contribute to the 20% standard."[65] However, other than lemons and butters, these "unrelated" tasks are the very same tasks that Tipped Employees have always performed and continue to perform to this date. Ironically, although Defendants claim to recognize that these tasks contribute to the twenty percent standard, the Universal Side Work policy actually increases the amount of cleaning and polishing to be performed and adds tasks such as "backwashing" espresso machines and running trays through a dishwasher.[66] Most importantly, in light of these operational changes, and despite the ease at which TCG could have tracked "side work" time, <u>Defendants still have done nothing to measure the amount of time spent by servers doing "side work"</u> to ensure that the servers are paid properly for this time.[67]

---

61      **Ex. DD**, Mitchell Tr. at 132:1-8; **Ex. JJ**, Rebecca Ledwell ("Ledwell Tr.") at 451:4-17.
62      *Id*.
63      **Ex. R,** Tip Share Rollout Program Guide, page 10.
64      *Id*.
65      *Id*
66      **Ex. KK** Universal Side Work, page bates numbered D000918.
67      Defendants now arbitrarily pay Tipped Employees the full minimum wage in one instance; when they arrive more than thirty (30) minutes prior to their shift. This comprises virtually none of the side work performed by the employees. *See* ex. **Ex. B,** Foye Tr. at 115:23-116:20; **Ex. F,** Dickstein Tr. at 190:14-191:5; **Ex. J,** Zemlock Tr. at 214:2-19; **Ex. P,** Hamilton Tr. at 117:19-119:4.

### 2. Defendants Required Tipped Employees To Share Tips With Employees Who Do Not Customarily And Regularly Receive Tips.

During the initial opening of a TCG restaurant and prior to the Tip Share Program, TCGs' tip pools were established in a uniform manner by "certified trainers."[68] TCG has instructed "certified trainers" to inform Tipped Employees as to who is included in the tip pool at TCG locations. At TCG, non-tip eligible employees, predominantly silverware polishers and/or dishwashers, have participated in the tip pools at the following locations: 42nd Street, New York,[69] Wall Street, New York,[70] Fort Lauderdale, Florida, Orlando, Florida,[71] Tampa, Florida,[72] Indianapolis, Indiana,[73] Charlotte, North Carolina,[74] Phoenix, Arizona,[75] and Pittsburg, Pennsylvania.[76] To date, no discovery has been conducted on other locations. Furthermore, Mr. Foye admitted that the Boca Raton, Florida Capital Grille had a silverware polisher in the tip pool, which did not belong there.[77] Moreover, in late 2010, emails were sent to MPs instructing them to remove silverware polishers from tip pools and to ensure that polishers were not receiving tips.[78] Nevertheless, no follow-up was conducted.[79]

While the FLSA permits the pooling of tips "among employees who customarily and regularly receive tips," and who have more than "*de minimis*" interaction with customers as a part of their employment, an employer who requires tipped employees to share gratuities with ineligible employees is not entitled to a tip credit. *See* 29 U.S.C. § 203(m). Silverware polishers

---

68    **Ex. B,** Foye Tr. at 66:5-13.
69    **Ex. EE,** Rella Tr. at 43:6-44:16.
70    **Ex. N,** Oliver Tr. at 109:18-19.
71    *Id.* at 18:7-19:16.
72    **Ex. O,** Duke Tr. at 182:4-16.
73    **Ex. L,** White Tr. at 75:9-12.
74    **Ex. JJ,** Ledwell Tr. at 393:12-24.
75    **Ex. M,** Beng Tr. at 81:22-82:3.
76    **Ex. BB,** Smith Decl. ¶ 10.
77    **Ex. B,** Foye Tr. at 106:25-108:7
78    **Ex. LL,**  Series of e-mails regarding silverware polishers in TCG tip pools ("Polisher Email")
79    **Ex. B,** Foye Tr. at 112:1-21.

and dishwashers cannot qualify as employees who customarily and regularly receive tips, as their primary responsibility was to clean flatware and glasses, and they performed this task in the kitchen, separated from Defendants' customers.[80]   Given that silverware polishers and dishwashers lacked any semblance of customer interaction, Defendants could not both require Tipped Employees to share gratuities with these positions, and avail themselves of the tip credit.

**B.    Defendants Have Not Compensated Tipped Employees For All Hours Worked.**

Due to Defendants' inherently flawed time keeping system and company-wide closing procedures, Tipped Employees regularly performed work off the clock at TCG, with the full knowledge of their managers. [81]

Defendants' "safe and secure" program, requires: "At least one Manager and two other employees … [to] be in the restaurant at all times … at opening and closing."[82]   In order for managers to run the end of night report, Tipped Employees must clock out. As such, safe and secure requires Tipped Employees to wait off the clock for their managers to complete their closing responsibilities before they are allowed to leave the restaurant.[83]

According to Mr. Foye, the same issue also occurred at the NYC-Wall Street TCG, where the MP was taking "a significant amount of time…after he ran the clock-out procedure to do paperwork."[84]   While Mr. Foye claims that this MP was terminated, the current NYC-Wall Street MP encountered identical issues when "team members" were forced to work off the clock while waiting for a manager to finish the "end of day" report.[85]   Furthermore, at least one DO instructed

---

80    *See, e.g.,* **Ex. K**, Chhab Tr. at 243:23-25, 270:3-11; **Ex. L**, White Tr. at 183:3-13; **Ex. N**, Oliver Tr. at 109:10-17; **Ex. JJ**, Ledwell Tr. at 438:6-10.

81    *See, e.g.,* **Ex. K**, Chhab Tr. at 205:21-206:1; **Ex. GG**, Benzion Tr. at 125:5-17; **Ex. EE**, Rella Tr. at 85:15-86:14.

82    *See* **Ex. MM**, The Capital Grille Recommitment 2011-2012, page 11.

83    *See, e.g.,* **Ex. K**, Chhab Tr. at 97:14-24, 100:17-22; **Ex. N**, Oliver Tr. at 101:4-20; **Ex. DD**, Mitchell Tr. at 81:2-16; **Ex. JJ**, Ledwell Tr. at 128:5-129:20.

84    **Ex. B**, Foye Tr. at 158:3-8.

85    *See* **Ex. NN**, E-mail from Joe Rossi (emphasis added).

his MPs that: "There should be no more than a five minute variance from the time the last team member clocks out until the closing manager runs end of day.  Team members can not being [sic] waiting for managers to close the restaurant off the clock."[86]  Thus, it is clear that Defendants' nationwide safe and secure policy commonly affected Tipped Employees by causing them to work off the clock.

TCGs' timekeeping system (DASH) has critical system-wide faults that lead to off the clock work.  In that regard, DASH prohibits Tipped Employees from clocking in more than five minutes before the start of their scheduled shift.[87]  DASH also prohibits Tipped Employees from clocking in if they are not listed on the schedule, either because they pick up the shift after the schedule has been made, or a manager forgets to enter them in.[88]  Further, DASH requires Tipped Employees working a double shift to clock out between shifts, even if they continue to perform work at the restaurant.[89]  DASH only authorizes managers to make adjustments in the system.[90]  Not surprisingly, managers are not always available, and do not always enter arrival times accurately.[91]  Consequently, TCGs' company-wide time keeping system uniformly causes Tipped Employees to work off the clock and not receive compensation for all hours worked.

### C.   Defendants Have Denied Tipped Employees Overtime Compensation.

Defendants do not contest that Tipped Employees were entitled to overtime wages when they worked more than forty hours per week.  *See* 29 U.S.C. 207(a)(1).  Indeed, when a Tipped Employee was ***clocked in*** for over forty hours in a given workweek, Defendants provided that individual with premium overtime compensation based on the tipped minimum wage rate.

---

86    **Ex. OO**, October 24, 2011 Email from Ron Adelman.
87    *See, e.g.,* **Ex. S,** Wirnowski Tr. at 26:22-27:9.
88    *Id.*  at 25:12-19.
89    *See, e.g.,* **Ex. FF**, Boreland Tr. at 112:13-113:15; *see also, e.g.,* **Ex. PP**, Deposition of John Mirabal at 204:1-12.
90    *See, e.g.,* **Ex. B**, Foye Tr. at 151:8-16; **Ex. S,** Wirnowski Tr. at 26:22-27:9.
91    *See, e.g.,* **Ex.  QQ**, November 30, 2011 Email from Chad Orth; **Ex. L,** White Tr. at 238:7-239:1; **Ex. EE**, Rella Tr. at 76:6-24; **Ex. N**, Oliver Tr. at 39:19-40:21.

However, since Defendants do not satisfy the requirements by which they can avail themselves of the tip credit, the overtime rates paid to Tipped Employees are inaccurate, as they are not calculated at time and one-half the full statutory minimum wage in accordance with the FLSA.  Moreover, when a tipped employee worked over 40 hours per week and some of that time was off the clock, there would be unpaid overtime for that period.

Additionally, Defendants further denied Tipped Employees overtime compensation by enforcing a *de facto* policy against overtime.[92]  At TCG, a Managers' bonus is, in part, tied to the total labor hours Tipped Employees work.[93]  As such, TCG incentivizes Managers to reduce the amount of time Tipped Employees work. In that regard, Defendants forced Tipped Employees to choose between (a) working off the clock if they approached 40 hours of work in a given workweek, and (b) having their shifts taken away if they recorded overtime hours.[94]

Defendants were certainly aware of the hours Tipped Employees were working. For example, Plaintiffs testified that managers had knowledge of Tipped Employees' actual hours.[95] In fact, given that managers had sole authority to adjust employees' times in DASH,[96] it is clear that, at the very least, Defendants turned a blind eye towards Tipped Employees off the clock work, to avoid paying premium overtime wages when they recorded over forty hours per week.

## ARGUMENT

## I.    CONDITIONAL CERTIFICATION OF THE NATIONWIDE FLSA COLLECTIVE IS APPROPRIATE HERE.

The FLSA authorizes aggrieved employees to bring a collective action "on behalf of themselves and other employees similarly situated."  29 U.S.C. § 216(b).

---

92    *See, e.g.,* **Ex. RR,** Email from James Hamilton regarding overtime; **Ex. K**, Chhab Tr. at 67:4-9; **Ex. L**, White Tr. at 217:15-218:18; **Ex. M**, Beng Tr. at 103:3-18; **Ex. N**, Oliver Tr. at 28:15-24.

93    **Ex. B,** Foye Tr. at 204:24-206:17.

94    *See, e.g.,* **Ex. L**, White Tr. at  227:2-20; **Ex. N**, Oliver Tr. at 33:4-13.

95    *See, e.g.,* **Ex. K**, Chhab Tr. at 205:21-206:1; **Ex. GG**, Benzion Tr. at 125:5-17; **Ex. EE**, Rella Tr. at 85:15-86:14.

96    **Ex. B,** Foye Tr. at 144:1-20.

Unlike a class action pursuant to Fed. R. Civ. P. 23, an employee in a collective action brought under FLSA § 216(b) is not a class member until her or she affirmatively opts-in to the collective action.  29 U.S.C. § 216(b).  Thus, until similarly-situated employees file consents to opt-in to this action, the statute of limitations continues to run against them on a daily basis. Therefore, it is critical that similarly-situated employees are afforded notice and an opportunity to opt-in as soon as possible, before their claims are reduced or extinguished by the passage of time.  *See Pippins v. KPMG LLP*, No. 11 Civ. 0377 (CM)(JLC), 2012 WL 19379, at *5 (S.D.N.Y Jan. 3, 2012).

### A.      The Two-Step Certification Process For FLSA Collective Actions

"Courts in this Circuit typically adhere to a two-stage framework in determining whether an FLSA claim may proceed as a collective action."  *Duarte v. Tri-State Physical Medicine & Rehabilitation, P.C.*, No. 11 Civ. 3765 (NRB), 2012 WL 2847741, at *5 (S.D.N.Y. July 11, 2012) (*citing Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir.  2010)).

At the first stage, "a court determines whether the named plaintiffs and the potential opt-in plaintiffs are sufficiently 'similarly situated' to issue notice and to allow the case to proceed as a collective action through discovery."  *In re Penthouse Exec. Club Compensation Litig.*, No. 10 Civ. 1145 (NRB), 2010 WL 4340255, at *2 (S.D.N.Y. Oct. 27, 2010).  In *Morris v. Lettire*,  this Court noted that, "A plaintiff's burden at this stage is minimal: He must only make a 'modest factual showing' that he and the potential opt-in plaintiffs were 'victims of a common policy or plan that violated the law."  *Morris v. Lettire Construction, Corp.*, No. 12 Civ. 0043 (NRB), 2012 WL 4320462, at *2 (S.D.N.Y. September 18, 2012) (*quoting Myers*, 624 F.3d at 555. "Nothing more is needed at this stage of the litigation."  *Shajan v. Barolo Ltd.*, No. 10 Civ. 1385 (CM), 2010 WL 2218095, at *1 (S.D.N.Y. June 2, 2010).

Given that certification at the first stage is preliminary and subject to reevaluation, the burden for demonstrating that potential plaintiffs are similarly situated is "very low or minimal." *Penthouse*, 2010 WL 4340255, at *2; *Morris*, 2012 WL 4320462, at *3.  Accordingly, "the court does not weigh the merits of the plaintiff's underlying claims … resolve factual disputes or resolve credibility" upon a motion for conditional certification.  *Morris*, 2012 WL 4320462, at *3; *see also Salomon v. Adderley Industries, Inc.*, No. 11 Civ. 6043 (PAC), 2012 WL 716197, at *1 (S.D.N.Y. March 6, 2012) ("[A] fact-intensive inquiry is inappropriate at the notice stage, as Plaintiffs are seeking only conditional certification.").  Rather, if the court finds that similarly situated potential plaintiffs exist, "the Court should conditionally certify the class, order that appropriate notice be given to putative class members, and the action should continue as a "collective action throughout the discovery process."  *Ferreira v. Modell's Sporting Goods, Inc.*, No. 11 Civ. 2395 (DAB), 2012 WL 2952922, at *2 (S.D.N.Y. July 16, 2012).

## B.   Plaintiffs Have Made The Required Showing That All Tipped Employees Are Similarly Situated.

"At this initial step, Plaintiffs need only provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist."  *Raniere v. Citigroup Inc.*, 827 F. Supp. 2d 294, 319 (S.D.N.Y. 2011).  Rather than proving an actual FLSA violation, "[p]laintiffs can satisfy their burden by showing there are other employees ... who are similarly situated with respect to their job requirements and with regard to their pay provisions."  *Salomon*, 2012 WL 716197, at *1 (*citing Myers*, 624 F.3d at 555); *see Morris*, 2012 WL 4320462, at *3 ("To satisfy this burden, the plaintiff must offer substantial allegations demonstrating a factual nexus between the plaintiff and the potential opt-in plaintiffs.").

While "Plaintiffs cannot rely on unsupported assertions to satisfy the modest factual showing … courts regularly rely on plaintiffs' affidavits and hearsay statements in determining

18

the propriety of sending notice."   Additionally, though "[e]vidence outside the scope of the complaint is properly considered [to satisfy the notice stage burden], … if defendants admit that the actions challenged by plaintiffs reflect a company-wide policy, it may be appropriate to find plaintiffs similarly situated based solely on plaintiffs' substantial allegations, without the need for additional evidence."  *Pippins*, 2012 WL 19379, at *6.  This is because "the relevant issue here is not whether Plaintiffs and [potential opt-in plaintiffs] were identical in all respects, but rather whether they were subjected to a common policy to deprive them of [FLSA wages]." *Raniere*, 827 F. Supp. 2d at 323.

Here, Plaintiffs easily meet their minimal initial stage burden.  Plaintiffs have made a strong preliminary showing, through their well-plead Complaint and deposition testimony, that Defendants subjected Plaintiffs and all other Tipped Employees at TCG to nationwide compensation policies, and that these policies violated the FLSA.  Specifically, Plaintiffs state that all Tipped Employees had the same job duties, received the same hourly wages (the tipped minimum wage rate), and were subjected to uniform corporate guidelines, "side work" programs, tip sharing policies, and time keeping procedures.  Plaintiffs' allegations aside, Defendants' internal documents, standing alone, clearly establish that TCG applied standardized wage and hour policies to its Tipped Employees nationwide, thus making conditional certification of Plaintiffs' claims appropriate here.  *See Morris*, 2012 WL 4320462, at *4 (stating that "the record support[ed] a reasonable inference that plaintiffs' experiences reflected a company-wide policy" where plaintiffs alleged that: (1) they received the same compensation no matter where they worked; (2) defendants' centrally operated and controlled all of its job sites; and (3) defendants' applied a company-wide compensation policy).

In a case involving nearly identical facts and claims, the court in *Fast v. Applebee's*

*Intern., Inc.*, denied the defendants' motion to decertify a nationwide class of "servers and bartenders at 'corporate' restaurants ... who were/are directed or permitted to perform duties that would not generate tips such as general maintenance and preparatory work in excess of twenty percent (20%) of their shift without paying them at least minimum wage for such work." *Fast v. Applebee's Intern., Inc.*, No. 06 Civ. 4146 (NKL), 2009 WL 2391921, at *1 (W.D.Mo. Aug. 3, 2009). In so ruling, the court specifically stated that "Plaintiffs have shown that they are similarly situated with respect to their job requirements and pay provisions," as:

> "First, they have demonstrated that their claims involve substantially similar factual and employment settings, despite minor variances restaurant-to-restaurant. Applebee's applied national uniform policies and practices relevant to its servers and bartenders, including policies concerning the tip credit, manager bonuses for productivity, complaint resolution, and job descriptions. Plaintiffs performed substantially the same job tasks under national guidelines. Plaintiffs were subject to similar pay structures … Second, liability in this case turns on class-wide claims and defenses, most notably whether Applebee's improperly took the tip credit for general maintenance and preparation work done by the class … Third, fairness and other procedural considerations weigh in favor of maintaining class certification."

*Id*. In fact, the Eighth Circuit later reaffirmed the district court's decision denying defendants' motion for summary judgment with respect to the twenty percent claim. *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 874 (8th Cir. 2011) *cert. denied,* 132 S. Ct. 1094 (U.S. 2012). In the present matter, Plaintiffs claims – arising from Defendants' universal compensation policies and "side work" requirements – mirror those in *Applebee's*, and likewise create a nationwide group of similarly situated employees who did not receive the appropriate minimum wage and overtime rate for all hours worked. An analogous result was reached in *Driver v. AppleIllinois, LLC*, where an Illinois district court certified restaurant servers' twenty percent claim under the more demanding requirements of Fed. R. Civ. P. 23. *Driver v. AppleIllinois, LLC*, No. 06 Civ. 6149

(GSB), 2012 WL 3716482, at *3 (N.D. Ill. Aug. 27, 2012).

### 1.      A Nationwide Collective Is Appropriate

Plaintiffs' deposition testimony describes nearly identical tip sharing, "side work," and time reporting practices at TCGs across the country.[97]   More importantly, these common practices are similarly described in Defendants' own deposition testimony and internal documents, evidencing that policies were created and administered from TCGs' corporate offices.[98]   Thus, Plaintiffs' evidence is probative that Defendants applied uniform compensation policies to all TCG restaurants. Courts in this circuit regularly find named plaintiffs to be similarly situated to employees at locations where they did not work when plaintiffs demonstrate they are subject to the same unlawful policies or plans. Recently, this Court conditionally certified a class of foremen and laborers at all of defendants' construction sites, including those where no named plaintiff worked, when plaintiffs were able to establish defendants had centralized control over all construction sites and evidence of a companywide policy. *Morris*, 2012 WL 4320462, at *5-6; *See also Stevens v. HMSHost Corp.*, 10 Civ. 3571 (ILG) (VVP), 2012 WL 4801784, at *3 (E.D.N.Y. Oct. 10, 2012) (conditionally certifying nationwide collective where Plaintiffs offered nationwide deposition testimony); *Ferreira*, 2012 WL 2952922, at *2 (finding that single plaintiff's allegations of FLSA violations at seven of defendants' locations, combined with documented company policies, suggested that the complained of practices were uniform at all of Defendants' 150 stores across the Northeast and warranted conditional certification); *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 403 (S.D.N.Y. 2012) (conditionally certifying nationwide collective where plaintiffs alleged that they were employed in the same position and not always compensated in accordance with the FLSA,

---

97      *See, e.g.,* **Ex. K**, Chhab Tr. at 127:15-17; **Ex. L**, White Tr. at 43:22-44:15; **Ex. M**, Beng Tr. at 49:17-23; **Ex. N**, Oliver Tr. at 102:22-24.
98      **Ex. B**, Foye Tr. at 182:24-183:13, 234:20-235:19.

and testified that they were aware of other putative class members who were similarly affected

by Defendants' wage and hour policies); *Pippins*, 2012 WL 19379, at * 4 (finding that plaintiffs'

complaint and affidavits, which described similar FLSA violations at offices in six different

states and alleged a uniform national policy, were sufficient to satisfy plaintiffs' minimal initial

stage burden); *In re Deloitte & Touche Overtime Litig.*, No. 10 Civ. 2461 (RMB), 2011 WL

6292923, at * (S.D.N.Y. Dec. 16, 2011) (conditionally certifying nationwide collective).

## II.     COURT-AUTHORIZED NOTICE IS APPROPRIATE IN THIS CASE.

In addition to an order conditionally certifying this nationwide collective action, Plaintiffs

also respectfully request for the Court to authorize that notice be sent to all Tipped Employees

employed at TCG since November 17, 2008.  While the FLSA does not expressly require courts

to authorize the sending of notice to potential opt-in plaintiffs, the Second Circuit recently

recognized that district courts "have discretion, in appropriate cases, to implement [§ 216(b)] …

by facilitating notice to potential plaintiffs" of the pendency of the action and of their

opportunity to opt-in as represented plaintiffs.  *Myers*, 624 F.3d at 554 (*citing Hoffman-LaRoche*,

493 U.S. at 169).

In the instant matter, time is of the essence as Tipped Employees' claims are being

diminished every day, and timely notice will curtail their continued erosion.  *See Pippins*, 2012

WL 19379, at *5.  Moreover, the fact that forty-five additional Tipped Employees have already

opted-in to this action clearly evidences an interest from other individuals who worked as Tipped

Employees at TCG to participate in this lawsuit.  As such, Plaintiffs respectfully request that the

Court order that notice to the potential opt-in plaintiffs be sent as soon practicable.

In addition to sending the Judicial Notice to similarly situated employees, Plaintiffs

respectfully requests the posting of the notice in a conspicuous location at each TCG restaurant.

"Courts routinely approve requests to post notice on employee bulletin boards and in other common areas, even where potential members will also be notified by mail." *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F.Supp.2d 449 (S.D.N.Y.2011) (collecting cases).

Attached as **Exhibit SS** is Plaintiffs' proposed Judicial Notice.  The proposed notice has been carefully drafted pursuant to standards articulated by this Court.   Indeed, Plaintiffs' proposed judicial notice is substantially similar to notices that have been approved in prior cases within this district, and achieves "the goals of the notice: to make as many potential plaintiffs as possible aware of this action and their right to opt in without devolving into a fishing expedition or imposing undue burden on the defendants."  *See Morris*, 2012 WL 4320462, at *6. Accordingly, Plaintiffs respectfully request that this notice be adopted.

Additionally, attached as **Exhibit TT** is Plaintiffs' proposed Reminder Letter.  By notifying potential plaintiffs that their right to join this lawsuit is limited, the Reminder Letter promotes the FLSA's broad remedial purpose, as well as the goal of court-authorized notice, by promoting efficient case management through notification and joinder of claims.  Accordingly, this Court has specifically stated that: "Given that notice under the FLSA is intended to inform as many potential plaintiffs as possible of the collective action and their right to opt-in, we find that a reminder notice [to alert potential plaintiffs that the deadline is coming due] is appropriate." *Morris*, 2012 WL 4320462, at *8.

## III.    A THREE YEAR NOTICE PERIOD IS APPROPRIATE.

The FLSA expressly permits a three-year statute of limitations to remedy willful violations of the Act.  *See* 29 U.S.C. § 255(a). While Defendants will argue that that their violations were not willful and that notice covering a two-year period is appropriate, such argument is without merit at this stage where the willfulness of a defendant's violations of the

FLSA is pled by a plaintiff.  *See e.g.*, *Guzelgurgenli v. Prime Time Specials Inc.*, No. 11 Civ. 4549 (ADS)(WDW), 2012 WL 3264314, at *14 (E.D.N.Y. Aug. 8, 2012) ("Where willfulness is in dispute, a three year statute of limitations applies at the conditional certification stage.").

## IV.   EXPEDITED DISCLOSURE OF NAMES AND CONTACT INFORMATION

In order to provide potential opt-in plaintiffs with notice of the pendency of this lawsuit, Plaintiffs require discovery of the names and contact information for those individuals.  "As has been noted by a number of courts in this circuit, courts often grant this kind of request in connection with a conditional certification of an FLSA collective action."  *Raniere*, 827 F. Supp. 2d at 327 (listing case); *Penthouse*, 2010 WL 4340255, at *5 (listing cases).  Indeed, "[i]t is now commonplace in this Circuit to require the provision of personal contact information to class counsel for the purposes of notifying a class of a collective action and enabling class counsel to obtain relevant discovery."  *Deloitte & Touche*, 2011 WL 6292923, at *1.

Accordingly, Plaintiffs respectfully request that the Court direct Defendants to produce a computer-readable list of the names, last known addresses, telephone numbers, e-mail addresses, work locations, and dates of employment for all persons employed by Defendants as Tipped Employees at TCG restaurants nationwide from November 17, 2008 to the present.  *See, e.g., Karic v. Major Automotive Companies, Inc.*, 799 F. Supp. 2d 219, 229 (E.D.N.Y. 2011) (ordering discovery of the name, last known mailing address, last known telephone number, work location, and dates of employment for all similarly situated employees).

## V.   EQUITABLE TOLLING

Should the Court grant the instant motion, Plaintiffs respectfully request that, to avoid inequitable circumstances, the FLSA statute of limitations be tolled until such time that they are able to send notice to potential opt-in plaintiffs.  Courts have granted such relief in FLSA cases

on the grounds that "[t]he delay caused by the time required for a court to rule on a motion, such as one for certification of a collective action in a FLSA case, may be deemed an 'extraordinary circumstance' justifying application of the equitable tolling doctrine." *Yahraes v. Rest. Associates Events Corp.*, No. 10 Civ. 935 (SLT), 2011 WL 844963, at *2 (E.D.N.Y. March 8, 2011) (collecting cases).

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court (1) conditionally certify this action as a collective action pursuant to Section 216(b) of the FLSA; (2) order Defendants to provide the names, last known addresses, telephone numbers, e-mail addresses, work locations, and dates of employment of all putative class members.

Dated: New York, New York
October 25, 2012

Respectfully submitted,

**FITAPELLI & SCHAFFER, LLP**

By:

/s/ Joseph A. Fitapelli
Joseph A. Fitapelli

**FITAPELLI & SCHAFFER, LLP**
Joseph A. Fitapelli
Brian S. Schaffer
Eric J. Gitig
475 Park Avenue South, 12th Floor
New York, New York 10016
Telephone: (212) 300-0375

*Attorneys for Plaintiff and
the Putative Class*