AFUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AHMED CHHAB on behalf of himself and all others
similarly situated,

            Plaintiffs,

      -against-

DARDEN RESTAURANTS, INC., GMRI, INC.,
CAPITAL GRILLE HOLDINGS, INC. d/b/a THE
CAPITAL GRILLE, and RARE HOSPITALITY
INTERNATIONAL, INC.,

           Defendants.

Index No.  11-cv-8345 (NRB/JLC)

---

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION PURSUANT TO THE FAIR LABOR STANDARDS ACT, FOR COURT-AUTHORIZED NOTICE TO SIMILARLY SITUATED PERSONS AND FOR EXPEDITED DISCOVERY

---

LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
Telephone: (212) 583-9600

*Attorneys for Defendants*

/s/ Craig Benson

Craig R. Benson, Esq.
John Ybarra, Esq.
Sarah E. Moss, Esq.

**TABLE OF CONTENTS**

**PAGE**

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   STATEMENT OF FACTS .............................................................................. 2

       A.    The Capital Grille ................................................................................ 2

             1.   Restaurant Structure. ............................................................ 2

             2.   Front-of-the-House ("FOH") Staff. ...................................... 2

             3.   Rates of Pay/Tip Credit. ....................................................... 3

       B.    Side Work .......................................................................................... 3

             1.   Pre-Universal Side Work ("PUSW"). .................................. 4

             2.   Universal Side Work ("USW") ............................................ 5

       C.    Tip Share ........................................................................................... 5

             1.   Pre-Universal Tip Share ("PUTS") (November 17, 2008 to November 13, 2011) ........................................................... 5

             2.   TCG Universal Tip Share Program ("UTS") (November 14, 2011 to the Present) ............................................................ 6

       D.    Employee Time Recording .................................................................. 7

             1.   TCG Time-Keeping System. ................................................. 7

             2.   TCG Time-Recording Policies. ............................................. 7

             3.   TCG Enforces Its Time-Recording Policies. ......................... 8

       E.    Overtime Scheduling .......................................................................... 9

       F.    TCG Safe and Secure Policy............................................................... 9

III.  ARGUMENT ................................................................................................ 10

       A.    Plaintiffs Are Not Entitled To Conditional Certification.................... 10

             1.   Legal Standard For Conditional Certification........................ 10

             2.   Plaintiffs Are Not Similarly Situated To Putative Collective Members With Respect To Their Off-The-Clock Claims ....... 11

TABLE OF CONTENTS
(CONTINUED)

a.    Plaintiffs Have Not Established A Facially or De Facto Illegal Practice Stemming From the Company's Safe and Secure Policy ............................................................. 12

b.    Plaintiffs Have Failed To Demonstrate A Facially or De Facto Illegal Practice Stemming From Darden's Time-Keeping System ................................................... 13

c.    Plaintiffs Have Failed To Demonstrate A Facially or De Facto Illegal Practice With Respect To Overtime ..................... 14

d.    Conditional Certification Is Improper On Plaintiffs' Off-The-Clock Claims ........................................................ 15

3.    Plaintiffs Are Not Similarly Situated To Putative Collective Members With Respect To Their Tip Share Claims............................... 16

4.    Plaintiffs Are Not Similarly Situated To Putative Collective Members With Respect To Their Side Work Claim............................... 17

a.    Plaintiffs Have Not Shown There Was A Common Side Work Policy Prior To November 2011, Nor That Each Restaurant's Policy Was Unlawful ............................... 18

b.    Plaintiffs Have Not Shown That The USW Policy Is Unlawful ...................................................................... 19

c.    Plaintiffs and Putative Collective Members Are Not Similarly Situated In Connection With A Claim Under The 20% Rule................................................................... 19

d.    Individualized Differences Make It Impossible To Show Common Proof.................................................................. 20

5.    Plaintiffs Case Law Regarding the 20% Claim Is Inapposite.................. 21

B.    Plaintiff's Proposed Notice and Related Requests Should Be Denied ................ 23

1.    The Proposed Notice is Materially Deficient........................................... 23

2.    Plaintiffs' Request To Post Notice In TCG Locations Should Be Denied .............................................................................................. 24

3.    Plaintiffs' Request To Send A Reminder Notice Should Be Denied....... 25

TABLE OF CONTENTS
(CONTINUED)

PAGE

4.    Plaintiffs' Request For Emails and Telephone Numbers Should Be
       Denied .................................................................................................. 25

C.    Equitable Tolling Should Be Denied ................................................................. 25

D.    Conclusion ......................................................................................................... 25

iii.

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barfield v. New York City Health & Hosps. Corp.,*
    2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 17, 2005) .......................................................11

*Brickey v. DolgenCorp.,*
    272 F.R.D. 344 (W.D.N.Y. 2011) .................................................................................13, 15

*Brown v. ScriptPro, LLC,*
    2012 U.S. App. LEXIS 24364 (10th Cir. Nov. 27, 2012) .......................................................14

*Diaz v. Elecs. Boutique of Am., Inc.,*
    2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) .....................................................11

*Diaz v. S&H Bondi's Dept. Store, Inc.,*
    2012 U.S. Dist. LEXIS 5683 (S.D.N.Y. Jan. 17, 2012) ..................................................23, 24

*Driver v. AppleIllinois*
    2012 U.S. Dist. LEXIS 1213312 ..........................................................................................21

*Eng-Hatcher v. Sprint Nextel Corp.,*
    2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) ....................................................12

*Fast v. Applebees Int'l, Inc.,*
    638 F.3d 872 (8th Cir. 2011), *cert denied*, 132 S. Ct. 1094 (2012) ...........................18, 21, 22

*Gillian v. Starjem Rest. Corp.,*
    2011 U.S. Dist. LEXIS 115833 (S.D.N.Y. Oct. 4, 2011) (Rackoff, J.) .............................11, 16

*Guzelgurgenli v. Prime Time Specials, Inc.,*
    2012 U.S. Dist. LEXIS 113212 (E.D.N.Y. Aug. 8, 2012) ......................................................25

*Hernandez v. Merrill Lynch & Co.,*
    2012 U.S. Dist. LEXIS 49822 (S.D.N.Y. April 6, 2012) ..................................................23, 24

*Hintergerger v. Catholic Health Sys.,*
    2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 21, 2009) .................................................24, 25

*Hoffmann-La Roche, Inc. v. Sperling,*
    493 U.S. 165 (1989) ..............................................................................................................10

*Holzapefel v. Town of Newburgh,*
    145 F.3d 516 (2d Cir. 1998) ..................................................................................................14

*In re Penthouse Exec. Club Comp. Litig.*,
    2010 U.S. Dist. LEXIS 114743 (S.D.N.Y. Oct. 27, 2010) (Buchwald, J.)..............................24

*Joza v. Ramada Plaza Hotel*,
    2010 U.S. Dist. LEXIS 94419 (E.D.N.Y. Sept. 9, 2010)........................................................14

*Knispel v. Chrysler Group LLC*,
    2012 U.S. Dist. LEXIS 21188 (E.D. Mich. Feb. 21, 2012)....................................................25

*Morales v. Plantworks, Inc.*,
    2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. June 12, 2006)........................................................11

*Morris v. Lettire Constr. Corp.*,
    2012 U.S. Dist. LEXIS 134860 (S.D.N.Y. Sept. 18, 2012)....................................................22

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)...................................................................................................11

*Pearl v. City of Long Beach*,
    296 F.3d 76 (2d Cir. 2006).....................................................................................................25

*Seever v. Carrols Corp.*,
    528 F. Supp. 2d 159 (W.D.N.Y. 2007) ................................................................................14

*Shajan v. Barolo, Ltd.*,
    2010 U.S. Dist. LEXIS 54581 (S.D.N.Y. June 2, 2010)........................................................24

*Stevens v. HMSHost Corp.*,
    2012 WL 4801784 (E.D.N.Y. Oct. 10, 2012)......................................................................23

*Strait v. Belcan Engineering Group, Inc.*,
    2012 U.S. Dist. LEXIS 169390 (N.D. Ill. Nov. 29, 2012)...............................................11, 21

*Turner v. Millennium Park Joint Venture, LLC*,
    767 F. Supp. 2d 951 (N.D. Ill. 2011) ...................................................................................16

*White v. Baptist Mem'l Health Care Corp.*,
    2012 U.S. App. LEXIS 22752 (6th Cir. Nov. 6, 2012) ........................................................14

## STATUTES

29 U.S.C. § 201 et. seq................................................................................................ passim

43 F.R.D. at 364.............................................................................................................22

## OTHER AUTHORITIES

DOL FIELD OPERATIONS HANDBOOK § 30d04(c) ........................................................16

# I.    PRELIMINARY STATEMENT

Plaintiffs Ahmed Chhab, Lance Feldhun, Adrienne Benzion, Kathryn Shrader, Vincent Anthony Boreland, and Michael Rella ("Plaintiffs")[1] ask this Court to conditionally certify and facilitate notice to a nationwide collective of individuals who worked as Servers and Bartenders at The Capital Grille ("TCG" or "Company") and who allegedly are owed minimum wage and overtime compensation under the Fair Labor Standards Act ("FLSA").[2] Upon a review of the record, it is difficult to imagine a set of facts less suitable for collective action treatment.

Plaintiffs accuse TCG of maintaining unlawful "policies" relating to off-the-clock work, tip sharing, and side work, but are unable to identify a single unlawful policy that provides the requisite uniformity.  As such, Plaintiffs' case is actually premised on the notion that TCG maintains common *deviations* from its lawful policies.  However, Plaintiffs' "evidence" regarding such alleged deviations does not in any way establish a common "nationwide practice."  Far from it, Plaintiffs' allegations of common deviations are limited to their inconsistent testimony of their own alleged experiences and observations, and their admitted disregard for TCG's lawful policies at the TCG locations where they worked.

TCG operates 48 restaurants in 20 states. The evidence here, including Plaintiffs'

---

[1] "Plaintiffs" refers collectively to those individuals named in the Amended Complaint and those who have filed consents to join the putative collective in this action.

[2] Although the Amended Complaint brings claims for minimum and overtime wages on behalf of all tipped hourly employees (Am. Comp. ¶1), Plaintiffs' Motion defines the proposed class as Servers and Bartenders only.  Thus, they no longer seek to represent other tipped positions.  Plaintiffs' Motion also does not mention, let alone seek to certify, certain claims alleged in the Amended Complaint, including claims involving donning and doffing (Am. Compl. ¶¶114, *passim*), failure to give notice of the tip credit (Am. Compl. ¶211), and an alleged TCG policy of having people wait to clock in until their first table arrives, clocking out after final table leaves and encouraging people to work entire shifts off the clock (Am. Compl. ¶¶7-8). With respect to the latter, Plaintiffs admit to deliberately failing to clock in so that they could keep their hours down and pick up additional shifts later in the week without running the risk of working into overtime. **Ex. 1**, Kathryn Shrader Deposition ("Shrader Tr.") 52:20-53:3; **Ex. 2**, Michael Rella Deposition ("Rella Tr.") 215:16-24; **Ex. 3**, Crystal Beng Deposition ("Beng Tr.") 91:15-19, 98:17-99:3, 154:21-155:2; **Ex. 4**, Vincent Boreland Deposition ("Boreland Tr.") 68:21-69:8; **Ex. 5**, Adrienne Benzion Deposition ("Benzion Tr.") 102:15-103:14 (she would "manipulate" her time records so she could make "double the money" by working "better shifts").

testimony, confirms that the "practices" alleged in the Amended Complaint varied from location to location, manager to manager, day to day, and shift to shift. Plaintiffs have not even shown that they are similarly situated to one another, let alone thousands of putative collective members. Thus, nationwide certification is not proper, and Plaintiffs' motion should be denied.

## II.   STATEMENT OF FACTS

### A.   The Capital Grille

1.   <u>Restaurant Structure:</u>  TCG was owned by RARE Hospitality, Inc. until 2007, when it was purchased by Darden Restaurants, Inc.[3] There are 48 separate TCG locations, located across 20 states.[4] Each TCG location differs in its physical structure and the restaurant's operational needs.[5] Each TCG also has a Managing Partner ("MP"), who is the head of his/her particular restaurant. MPs have broad authority to operate their specific restaurant as they deem appropriate, within the bounds of the lawful policies and guest service standards instituted by TCG.[6] In this regard, MPs often adopt certain practices unique to their location based upon the make-up of the restaurant, the staff, the surrounding community, the climate and the culture.[7]

2.   <u>Front-of-the-House ("FOH") Staff:</u>  FOH staff members at TCG can include: (1) Servers; (2) Bartenders; (3) Server Assistants; (4) Food Runners; (5) Bar Runners; and (6) Cocktail Servers.[8] Restaurant managers bring new FOH employees through orientation, which includes reviewing the TCG Employee Handbook and explaining the restaurant's particular policies.[9] The Employee Handbook contains important company policies, like the

---

[3]  **Ex. 6**, Tom Gathers Deposition ("Gathers Tr."), 31:19-32:5.
[4]  **Ex. 7**, list of TCG locations from Service Assistant Manual.
[5]  **Ex. 8**, Declaration of Joseph Rossi ("Rossi Dec.") ¶¶5, 13.
[6]  **Ex. 9**, Brian Foye Deposition ("Foye Tr.") 133:19-134:1; **Ex. 10**, TCG Team Member Handbook, p. 45 (MPs make "ultimate decision" whether to accept an employee transfer from another location).
[7]  **Ex. 8**, Rossi Dec., ¶¶12-15; **Ex. 11**, Declaration of John Kelly ("Kelly Dec."), ¶24).
[8]  **Ex. 11**, Standardized "One Best Way" Tip Share Rollout Guide, p. 5.
[9]  **Ex. 13**, Declaration of Richard McMaster ("McMaster Dec.") ¶4; **Ex. 14**, Declaration of Kathleen Calkins ("Calkins Dec.") ¶6; **Ex. 11**, Kelly Dec. ¶14; **Ex. 15**, Declaration of Armin Ahrabinejad ("Ahrabinejad Dec.") ¶5;

requirement that all employees be clocked in when performing work and that they notify a manager if their paycheck does not reflect payment for all hours worked.[10] Prior to November 2011, tipped employees also signed a form at the time of hire acknowledging that their participation in the particular restaurant's tip share program was voluntary.[11]

       3.    <u>Rates of Pay/Tip Credit</u>:  At some TCG locations, Servers and Bartenders are paid at the federal or applicable state tipped minimum wage rate.[12] At other TCG locations, specifically those in California, Minnesota, Nevada, and Washington, Servers and Bartenders are paid at no less than the full minimum wage rate for every hour worked.[13]

**B.**    **Side Work**

    TCG MPs assign "side work" to their tipped staff as part of their employees' shifts.[14] Within the industry, side work has traditionally been an integral part of the job for tipped employees.  The purpose of side work is to enable tipped employees to provide a better level of services to guests.[15]  There are two time periods relevant to Plaintiffs' claims involving side work—Pre-Universal Side Work (November 17, 2008 to November 13, 2011) and Universal Side Work (November 14, 2011 to the present).

---

**Ex. 16**, Declaration of Paul Muszynski ("Muszynski Dec.") ¶12;  **Ex. 17**, Declaration of Melissa Trumbull ("Trumbull Dec.") ¶5; **Ex. 18**, Declaration of Allen Witcher ("Witcher Dec.") ¶11; **Ex. 19**, Declaration of Bart Hickey ("Hickey Dec.") ¶4; **Ex. 20**, Declaration of Christopher Amman ("Amman Dec.") ¶16; **Ex. 21**, Declaration of Gordon Leigh ("Leigh Dec.") ¶14; **Ex. 22**, Declaration of Randy Cook ("Cook Dec.") ¶5; **Ex. 23**, Declaration of John Mirabal ("Mirabal Dec.") ¶11; **Ex. 24**, Declaration of David Icken ("Icken Dec.") ¶7; **Ex. 25**, Declaration of Jason Maas ("Maas Dec.") ¶3; **Ex. 26**, Declaration of Joel Mendieta ("Mendieta Dec.") ¶3; **Ex. 27**, Declaration of David Fields ("Fields Dec.") ¶5; **Ex. 28**, Declaration of Paul Villani ("Villani Dec.") ¶¶3-4.

[10] **Ex. 10**, TCG Team Member Handbook, p. 31 ("**You should report any errors on your paycheck to a manager immediately. Your paycheck should reflect payment for all hours worked. No employee is ever permitted to work 'off the clock' for any reason.**") (emphasis in original).

[11] **Ex. 29**, signed voluntary tip share acknowledgements from Lance Feldhun, Kathryn Shrader and Crystal Beng.

[12] **Ex. 9**, Foye Tr. 62:22-64:4; **Ex. 6**, Gathers Tr. 67:13-68:2; **Ex. 10**, TCG Tem Member Handbook, p. 33.

[13] **Ex. 6**, Gathers Tr. 67:13-68:2; **Ex. 12**, Standardized "One Best Way" Tip Share Rollout Guide, p. 47-48.

[14] **Ex. 24**, Icken Dec. ¶20; **Ex. 30**, Declaration of Kyle Gaffney ("Gaffney Dec.") ¶¶7-8, 10; **Ex. 13**, McMaster Dec. ¶10; **Ex. 16**, Muszynski Dec. ¶7. **Ex. 31**, Declaration of James Zemlock ("Zemlock Dec.") ¶12; **Ex. 20**, Amman Dec. ¶30.

[15] For example, as part of their side work, Bartenders may ensure they have enough mint available to garnish a drink, because if they do not, they will likely get less of a tip since the guest has to wait.  **Ex. 32**, Declaration of Ira Zipper ("Zipper Dec.") ¶17.

3

1.   <u>Pre-Universal Side Work ("PUSW")</u>:   Prior to November 14, 2011, there was no single policy or practice regarding side work common to all TCGs. Indeed, each of the then-existing 44 TCGs had its own side work policy.[16] In some locations, the side work policy was created by the MP, and in others, it was created by the staff.[17] Thus, the side work policies at each TCG were created by different people and tailored to the specific needs of the restaurant.[18]

MPs are trained that side work should take no longer than 30 minutes per shift.[19] As part of this training, MPs perform every side work task at the restaurant; from this experience, MPs understand how long each assignment takes to complete.[20] Using this knowledge, MPs ensure, as part of their supervision of the restaurant, that employees do not spend extended amounts of time performing their side work duties.[21] This 30 minute or less expectation is confirmed by many putative collective members from locations including Tyson's Corner, VA; Chevy Chase, MD; Baltimore, MD; Seattle, WA; King of Prussia, PA; Phoenix, AZ; Palm Beach Gardens, FL; Lombard, IL; Rosemont, IL, Charlotte, NC; Indianapolis, IN; Kansas City, MO; and Pittsburgh, PA. These individuals attest that before November 2011, their side work took between 0 to 40 minutes, and the precise time depended on many factors and varied based on the day and shift.[22]

---

[16] **Ex. 33**, Pre-Universal Side Work policies for the 44 then-existing locations.

[17] **Ex. 34**, Jill Dickstein Deposition ("Dickstein Tr.") 51:7-25; **Ex. 15**, Ahrabinejad Dec. ¶8; **Ex. 19**, Hickey Dec. ¶9.

[18] For example, Servers at the Troy, MI TCG did not make setups, whereas Servers at the Wall Street TCG did. *Compare* **Ex. 11**, Kelly Dec. ¶24 *with* **Ex. 35**, Tasiya Oliver Deposition ("Oliver Tr.") 68:9-14.

[19] **Ex. 9**, Foye Tr. 94:3-19, 117:3-12 (pre-universal expectation of 0-30 minutes for side work).

[20] **Ex. 8**, Rossi Dec. ¶20; **Ex. 15**, Ahrabinejad Dec. ¶8; **Ex. 36**, Declaration of Jill Dickstein ("Dickstein Dec.") ¶22; **Ex. 23**, Mirabal Dec. ¶4; **Ex. 22**, Cook Dec. ¶3; **Ex. 17**, Trumbull Dec. ¶22; **Ex. 21**, Leigh Dec. ¶24.

[21] **Ex. 21**, Leigh Dec. ¶24; **Ex. 8**, Rossi Dec. ¶20; **Ex. 17**, Trumbull Dec. ¶22; **Ex. 22**, Cook Dec. ¶3; **Ex. 23**, Mirabal Dec. ¶4; **Ex. 36**, Dickstein Dec. ¶22.

[22] **Ex. 37**, Declaration of Nicholas Lazo ("Lazo Dec.") ¶¶12, 16 (0-30 minutes); **Ex. 38**, Declaration of Harry Webb ("Webb Dec.") ¶¶12, 17 (18-30 minutes); **Ex. 39**, Declaration of Agne Salgado ("Salgado Dec.") ¶¶8, 11 (20-30 minutes) ; **Ex. 40**, Declaration of James Keefover ("Keefover Dec.") ¶¶7,9, 11, 13 (20-40 minutes); **Ex. 26**, Mendieta Dec. ¶10 (20-40 minutes); **Ex. 41**, Declaration of Michelle Stewart ("Stewart Dec.") ¶7 (30 minutes); **Ex. 42**, Declaration of Craig Perez ("Perez Dec.") ¶10 (20-30 minutes); **Ex. 32**, Zipper Dec. ¶¶16, 20 (10-30 minutes); **Ex. 43**, Declaration of Bobbie Jo Martino ("Martino Dec.") ¶¶10-13 (25-30 minutes); **Ex. 44**, Declaration of Kevin Scheerle ("Scheerle Dec.") ¶10 (15-30 minutes); **Ex. 45**, Declaration of Todd Cain ("Cain Dec.") ¶12 (20-25 minutes); **Ex. 46**, Declaration of Brooke Currier ("Currier Dec.") ¶8 (0-40 minutes); **Ex. 25**, Maas Dec. ¶8 (15-30 minutes); **Ex. 47**, Declaration of Ricardo Reyes ("Reyes Dec.") ¶10 (25-35 minutes); **Ex. 48**, Declaration of Shawn Martin ("Martin Dec.") ¶16  (5-30 minutes); **Ex. 49**, Declaration of Marisha Mayer ("Mayer Dec.") ¶¶11-13 (10-35

    2.    <u>Universal Side Work ("USW")</u>:  On or about November 14, 2011, TCG rolled out its USW policy.[23] The purpose of this policy is to provide a single platform for side work that each TCG restaurant could adopt.[24] This policy is *not* a rigid list of tasks to be performed at every restaurant. Rather, it serves as a guideline for MPs to assign side work, to the extent it is applicable to the restaurant.[25] The USW policy also re-affirms that tipped employees should not spend more than 20% of their shifts on side work that may not be deemed tip-producing.[26]

## C.    Tip Share

    1.    <u>Pre-Universal Tip Share ("PUTS") (November 17, 2008 to November 13, 2011)</u>: Prior to November 2011, there was no TCG-wide common policy regarding tip share. The tip share program at each TCG restaurant was established by the tipped staff themselves, without the participation of restaurant management. Indeed, when a new restaurant opened, the tipped employees would establish how they wanted the tip share program to function at that restaurant.[27] Contrary to Plaintiffs' assertion, which is unsupported by any record citation, Certified Trainers, who are tipped employees and not managers, were not instructed by TCG to inform other tipped employees as to which positions should be in the tip share. Putative collective members attested that, prior to November 2011, tip sharing was voluntary, and was not implemented, mandated, or enforced by TCG management or Certified Trainers.[28] When a new

---

minutes); **Ex. 50**, Declaration of Patty Stoetzer ("Stoetzer Dec.") ¶¶9, 12 (0-15 minutes).

[23] **Ex. 51**, Email regarding implementation of Universal Tip Share Rollout; **Ex. 52**, Universal Side Work Manual.

[24] **Ex. 9**, Foye Tr. 78:16-21 (USW implemented because of "wide spectrum of side work methods and practices").

[25] **Ex. 53**, Mirabal Tr. 234:16-236:23 (identifying USW tasks not done at the Indianapolis TCG).

[26] **Ex. 11**, Standardized "One Best Way" Tip Share Rollout Guide, p. 10.

[27] **Ex. 54**, Declaration of Joshua Butts ("Butts Dec.") ¶23 (learned of tip share from other Servers.); **Ex. 48**, Martin Dec. ¶5 (learned of tip share from Certified Trainer);**Ex. 49**, Mayer Dec. ¶15 (same); **Ex. 14**, Calkins Dec. ¶24; **Ex. 41**, Martino Dec. ¶¶23-27 (Servers and Bartenders decided whom to tip out and how much); **Ex. 37**, Lazo Dec. ¶17 (told about tip share by other Servers); **Ex. 38**, Webb Dec. ¶18 (told about tip share by another Server); **Ex. 45**, Cain Dec. ¶14 (trainer explained tip share was decided by staff); **Ex. 47**, Reyes Dec. ¶13 (same).

[28] **Ex. 55**, Declaration of Danny Van Wie "(Van Wie Dec.") ¶¶16-18; **Ex. 54**, Butts Dec. ¶¶23; **Ex. 46**, Currier Dec. ¶11; **Ex. 56**, Declaration of Angela Miceli ("Miceli Dec.") ¶18; **Ex. 26**, Mendieta Dec. ¶12; **Ex. 45**, Cain Dec. ¶14; **Ex. 47**, Reyes Dec. ¶13; **Ex. 27**, Fields Dec. ¶15; **Ex. 32**, Zipper Dec. ¶22; **Ex. 43**, Martino Dec. ¶23; **Ex. 50**, Stoetzer Dec. ¶10; **Ex. 49**, Mayer Dec. ¶16; **Ex. 57**, Declaration of Donald Harvey ("Harvey Dec.") ¶14; **Ex. 58**,

TCG location opened, Certified Trainers informed the new staff of the tip sharing programs at other locations.  The staff could adopt one of the tip share programs or create their own.[29]

Plaintiffs' assertions that tip outs to "silverware polishers" and Dishwashers occurred at all TCG locations is likewise unsupported. In fact, the record establishes that this polisher position has not even existed at many TCGs, including TCGs in Baltimore and Chevy Chase, MD; Seattle, WA; Palm Beach Gardens, FL; Phoenix, AZ; Tyson's Corner, VA; and Pittsburgh and King of Prussia, PA.[30] Moreover, to the extent that individuals performed polishing duties, they did so either in a position that was not tipped, or if a tip out was made, it was done voluntarily and without the involvement of management.[31]

Even where tips to polishers or Dishwashers were voluntarily provided by the other tipped employees, management attempted to end such practices when it learned of them. For example, Plaintiffs testified that Servers tipped out the Dishwashers at the TCG 42nd St. location until management learned of the practice and directed them to stop.[32] Servers briefly complied with this directive before resuming their private arrangement to voluntarily tip out the Dishwasher.[33] In addition, the TCG Directors of Operations emailed MPs to inform them that, if they had someone polishing in their restaurants, that person should not be receiving tips.[34]

2.  <u>TCG Universal Tip Share Program ("UTS") (November 14, 2011 to the Present):</u>

On November 14, 2011, TCG implemented its UTS program to be used at all TCG locations,

---

Declaration of Stella Constantinou ("Constantinou Dec.") ¶14.
[29] **Ex. 54**, Butts Dec. ¶24; **Ex. 45**, Reyes Dec. ¶13.
[30] **Ex. 54**, Butts Dec. ¶21; **Ex. 26**, Mendieta Dec. ¶11; **Ex. 41**, Stewart Dec. ¶14; **Ex. 46**, Currier Dec. ¶14; **Ex. 47**, Reyes Dec. ¶15; **Ex. 45**, Cain Dec. ¶15; **Ex. 38**, Webb Dec. ¶20); **Ex. 43**, Martino Dec. ¶28.
[31] **Ex. 68**, Amy Mitchell Deposition ("Mitchell Tr.") 44:14-22, 51:15-23; **Ex. 32**, Zipper Dec. ¶22; **Ex. 25**, Maas Dec. ¶10; **Ex. 55**, Van Wie Dec. ¶¶16-17; **Ex. 59**, Declaration of Michael Martorella ("Martorella Dec.") ¶18; **Ex. 42**, Perez Dec. ¶11; **Ex. 50**, Stoetzer Dec. ¶10; **Ex. 49**, Mayer Dec. ¶17; **Ex. 28**, Villani Dec. ¶17
[32] **Ex. 1**, Shrader Tr. 156:21-157:21.
[33] **Ex. 60**, Deposition of Lance Feldhun ("Feldhun Tr.") 177:3-179:2.
[34] **Ex. 61**, December 2010 emails regarding not tipping out polishers.

except for those in Troy MI, Minneapolis, MN and Charlotte, NC.[35] In addition to providing a fairer compensation system, the UTS program introduced management supervision and ensured that only tip-eligible employees received tips. Plaintiffs do not allege that UTS is unlawful or that there was a common deviation from the program to include non-tip eligible employees.

**D.   Employee Time Recording**

1.   <u>TCG Time-Keeping System</u>:  TCG restaurants use a point-of-sale system called Darden Applications for Service and Hospitality System ("DASH"), which performs many functions, including acting as a time-recording device for restaurants.[36] Each week, managers input employee schedules into DASH, which enables employees to clock in within 5 minutes of their scheduled start time.[37] Contrary to Plaintiffs' assertion, employees are also able to clock in more than 5 minutes before their scheduled start time or if they are not on the schedule at all, by simply enlisting the assistance of a manager, who will authorize the clock in at the time the employee states that he/she began working.[38] Plaintiffs and putative collective members admit that this procedure is communicated to, and utilized by, them and other employees.[39]

2.   <u>TCG Time-Recording Policies</u>:  TCG's time-recording policies require, among other things, that employees are clocked in for all of their time working.[40] At hire and throughout their employment, employees are informed and reminded of these policies.[41] Plaintiffs and

---

[35] **Ex. 11**, Kelly Dec. ¶4-8; **Ex. 18**, Witcher Dec. ¶6; and **Ex. 15**, Ahrabinejad Dec. ¶13.

[36] **Ex. 62**, Deposition of Mark Wirnowski ("Wirnowski Tr.") 18:1-8.

[37] *Id.* at 26:22-27:9.

[38] Key Employees, some of whom are Servers, can also adjust employees' time as needed. **Ex. 44**, Scheerle Dec. ¶8.

[39] *Id.*; **Ex. 37**, Lazo Dec. ¶8; **Ex. 63**, Declaration of Krista Hassinger ("Hassinger Dec.") ¶4; **Ex. 38**, Webb Dec. ¶¶8-9; **Ex. 56**, Miceli Dec. ¶8. **Ex. 26**, Mendieta Dec. ¶5; **Ex. 42**, Perez Dec. ¶5; **Ex. 59**, Martorella Dec. ¶10; **Ex. 55**, Van Wie Dec. ¶7; **Ex. 45**, Cain Dec. ¶9; **Ex. 47**, Reyes Dec. ¶8; **Ex. 46**, Currier Dec. ¶¶6-7; **Ex. 58**, Constantinou Dec. ¶8; **Ex. 50**, Stoetzer Dec. ¶7; **Ex. 49**, Mayer Dec. ¶8; **Ex. 54**, Butts Dec. ¶6; **Ex. 28**, Villani Dec. ¶8.

[40] **Ex. 10**, TCG Team Member Handbook, p. 31.

[41] **Ex. 64**, Spring 2010 Manager Recommitment, p. 7; **Ex. 10**,TCG Employee Handbook, p. 28, 31; **Ex. 27**, Fields Dec. ¶5; **Ex. 58**, Constantinou Dec. ¶¶5-6; **Ex. 32**, Zipper Dec. ¶8; **Ex. 37**, Lazo Dec. ¶¶4-5; **Ex. 26**, Mendieta ¶3; **Ex. 50**, Stoetzer Dec. ¶4; **Ex. 42**, Perez Dec. ¶3; **Ex. 38**, Webb Dec. ¶¶4-5; **Ex. 56**, Miceli Dec. ¶¶4-5; **Ex. 57**, Harvey Dec. ¶4; **Ex. 48**, Martin Dec. ¶¶3-4.

putative collective members know and understand these policies.[42]

3.   _TCG Enforces Its Time-Recording Policies:_   As is common in the industry, employees occasionally forget to clock in at the start of their shifts. When that happens, TCG protocol is for the employee to notify a manager that they forgot to clock in, at which point, the manager will clock in the employee and adjust his start time back to the time when the employee states that he started working.[43] Plaintiffs and putative collective members agree that when so alerted, managers have accurately adjusted their time.[44]

A similar protocol is followed when employees forget to clock out at the end of their shift.  There, once the manager discovers the failure, the manager will consult with the employee after the shift, ask the employee what time he/she stopped working, and adjust the employee's clock out to reflect that time.[45] To ensure agreement on the adjusted time, the manager will produce a punch edit report reflecting the adjustment, which the employee reviews and signs.[46]

TCG's time recording policies extend to employees working both a lunch and dinner shift (commonly referred to as a "double shift"). When employees work double shifts, they do not have to clock out between shifts, but may do so in order to separate their lunch and dinner tips. [47] In such instances, the employee merely clocks out after the first shift and then instantly clocks

---

[42] **Ex. 65**, Ledwell Tr. 167:2-168:18; **Ex. 3**, Beng Tr. 99:4-13; **Ex. 68**, Mitchell Tr. 90:6-21; **Ex. 44**, Scheerle Dec. ¶7; **Ex. 46**, Currier Dec. ¶¶4-5; **Ex. 27**, Fields Dec. ¶6; **Ex. 37**, Lazo ¶7; **Ex. 26**, Mendieta Dec. ¶¶5-6; **Ex. 42**, Perez Dec. ¶7; **Ex. 56**, Miceli Dec. ¶7; **Ex. 59**, Martorella Dec. ¶9; **Ex. 45**, Cain Dec. ¶8; **Ex. 47**, Reyes Dec. ¶7; **Ex. 43**, Martino Dec. ¶6; **Ex. 50**, Stoetzer Dec. ¶5; **Ex. 25**, Maas Dec. ¶5.

[43] **Ex. 24**, Icken Dec. ¶12; **Ex. 15**, Ahrabinejad Dec. ¶5; **Ex. 30**, Gaffney Dec. ¶20; **Ex. 16**, Muszynski Dec. ¶13; **Ex. 36**, Dickstein Dec. ¶9; **Ex. 23**, Mirabal Dec. ¶14; **Ex. 19**, Hickey Dec. ¶5; **Ex. 14**, Calkins Dec. ¶9; **Ex. 13**, McMaster Dec. ¶¶6-7; **Ex. 66**, Declaration of Nick Kassis ("Kassis Dec.") ¶6; **Ex. 17**, Trumbull Dec. ¶5; **Ex. 21**, Leigh Dec. ¶16.

[44] **Ex. 60**, Feldhun Tr. 203:5-25; **Ex. 3**, Beng Tr. 98:24-99:13; **Ex. 1**, Shrader Tr. 52:10-19; **Ex. 28**, Villani Dec. ¶19; **Ex. 48**, Martin Dec. ¶21; **Ex. 39**, Salgado Dec. ¶12; **Ex. 40**, Keefover Dec. ¶4; **Ex. 57**, Harvey Dec. ¶5.

[45] **Ex. 22**, Cook Dec. ¶6; **Ex. 24**, Icken Dec. ¶12; **Ex. 15**, Ahrabinejad Dec. ¶5; **Ex. 16**, Muszynski Dec. ¶13; **Ex. 19**, Hickey Dec. ¶5; **Ex. 66**, Kassis Dec. ¶6; **Ex. 21**, Leigh Dec. ¶17.

[46] **Ex. 44**, Scheerle Dec. ¶8; **Ex. 19**, Hickey Dec. ¶5; **Ex. 18**, Witcher Dec. ¶14; **Ex. 72**, Declaration of Gwen Zimmer ("Zimmer Dec.") ¶ 9; **Ex. 62**, Wirnowski Tr. 45:20-46:1.

[47] **Ex. 23**, Mirabal Dec. ¶¶15-16; **Ex. 15**, Ahrabinejad Dec. ¶7; **Ex. 36**, Dickstein Dec. ¶10; **Ex. 20**, Amman Dec. ¶19; **Ex. 66**, Kassis Dec. ¶8; **Ex. 17**, Trumbull Dec. ¶10; **Ex. 21**, Leigh Dec. ¶21.

back in for the second shift, without any time elapsing between the two.[48] Based on TCG's time-recording policies and the admissions of Plaintiffs, employees understand that they should not be working off the clock, and double shifts present no exception to that policy.

### E.    Overtime Scheduling

There is no policy or practice prohibiting employees from working overtime. TCG recognizes overtime as a part of the cost of doing business. Employees are regularly scheduled to work overtime and are not disciplined for doing so.[49]

### F.    TCG Safe and Secure Policy

TCG has a "Safe and Secure" policy that requires that at least three employees, usually a manager and two hourly employees, be in the restaurant during its operating hours.[50] The two hourly employees can be either FOH or back-of-the-house ("BOH") employees, and often do not include any putative collective members.[51] Safe and Secure does not require employees to work off the clock. The purpose of the policy is to protect TCG employees and the restaurant.[52]

Each night, the closing manager runs the End of Day Report ("Report"), a daily report containing information about that day's sales, labor hours and operational expenses.[53] The closing manager inputs all of the required information into the computer system, and once completed, directs the two remaining hourly employees (which may, or may not, include putative collective members) to clock out. Once the manager gives this direction, he/she immediately presses the "Start" button on the computer to begin printing the Report. The manager then leaves the restaurant with the two hourly employees. The closing manager and the employees do not

---

[48] **Ex. 32**, Zipper Dec. ¶14; **Ex. 44**, Scheerle Dec. ¶6; **Ex. 48**, Martin Dec. ¶19; **Ex. 47**, Reyes Dec. ¶6.
[49] **Ex. 27**, Fields Dec. ¶8; **Ex. 44**, Scheerle Dec. ¶14; **Ex. 45**, Cain Dec. ¶10; **Ex. 26**, Mendieta Dec. ¶7; **Ex. 56**, Miceli Dec. ¶6; **Ex. 38**, Webb Dec. ¶6; **Ex. 63**, Hassinger Dec. ¶7; **Ex. 28**, Villani Dec. ¶6; **Ex. 49**, Mayer Dec. ¶6; **Ex. 40**, Keefover Dec. ¶6; **Ex. 25**, Maas Dec. ¶13; **Ex. 56**, Harvey Dec. ¶11; **Ex. 42**, Perez Dec. ¶8.
[50] **Ex. 67**, TCG's Safe and Secure Policy.
[51] **Ex. 11**, Kelly Dec. ¶22; **Ex. 36**, Dickstein Dec. ¶18.
[52] **Ex. 9**, Foye Tr. 153:12-17.
[53] **Ex. 9**, Foye Tr. 49:25-50:3; Wirnowski Tr. 32:10-21.

wait for the Report to finish printing before they exit.[54] Hourly employees do not spend any time waiting off the clock due to Safe and Secure.[55]

In rare instances where managers deviated from TCG policy by requiring hourly employees to wait off the clock, TCG took immediate steps to correct these deviations. For example, once the Company became aware that employees at the Wall Street, NY TCG were waiting off the clock for a few minutes for the closing manager to finish his duties, it promptly investigated the situation, determined the manager was violating the policy, terminated him, and paid all employees back wages for any time they spent waiting off the clock.[56]

Safe and Secure is not followed at every TCG.  For example, the Indianapolis TCG location does not follow it because it is located inside a hotel that provides 24-hour security.[57]

## III.   ARGUMENT

### A.   Plaintiffs Are Not Entitled To Conditional Certification

#### 1.   Legal Standard For Conditional Certification

The FLSA authorizes a plaintiff to file suit on behalf of "other employees similarly situated," but only if such employees "consent in writing." 29 U.S.C. § 216(b).  Court-ordered notice is not automatic. Rather, "district courts have the discretion, *in appropriate cases* ... to facilit[ate] notice to potential plaintiffs." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989) (emphasis added). Before a court will authorize such notice, a plaintiff "must demonstrate, based on pleadings and affidavits, that she is similarly situated to potential

---

[54] **Ex. 8**, Rossi Dec. ¶¶8-11; **Ex. 11**, Kelly Dec. ¶¶19-20; **Ex. 16**, Muszynski Dec. ¶15; **Ex. 21**, Leigh Dec. ¶4; **Ex. 13**, McMaster Dec. ¶5; **Ex. 31**, Zemlock Dec. ¶9; **Ex. 19**, Hickey Dec. ¶16; **Ex. 14**, Calkins Dec. ¶22; **Ex. 30**, Gaffney Dec. ¶12; **Ex. 17**, Trumbull Dec. ¶17.
[55] **Ex. 48**, Martin Dec. ¶20; **Ex. 44**, Scheerle Dec. ¶9; **Ex. 47**, Reyes Dec. ¶9; **Ex. 54**,Butts Dec. ¶19; **Ex. 28**, Villani Dec. ¶18; **Ex. 26**, Mendieta Dec. ¶9; **Ex. 25**, Maas Dec. ¶12; **Ex. 43**, Martino Dec. ¶19;  **Ex. 27**, Fields Dec. ¶6;  **Ex. 58**, Constantinou Dec. ¶15; **Ex. 50**, Stoetzer Dec. ¶15; **Ex. 42**, Perez Dec. ¶9;  **Ex. 63**, Hassinger Dec. ¶22; **Ex. 45**, Cain Dec. ¶11; **Ex. 36**, Dickstein Dec. ¶15; **Ex. 8**, Rossi Dec. ¶11; **Ex. 17**, Trumbull Dec. ¶16; **Ex. 21**, Leigh Dec. ¶¶5, 7; **Ex. 15**, Ahrabinejad Dec. ¶3; **Ex. 19**, Hickey Dec. ¶16; **Ex. 23**, Mirabal Dec. ¶26.
[56] **Ex. 9**, Foye Tr., 157:24-158:8.
[57] **Ex. 23**, Mirabal Dec. ¶26.

collective members." *Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010).

Plaintiffs must establish similarly situated status through a factual showing, not simply allegations. *See Barfield v. New York City Health & Hosps. Corp.*, 2005 U.S. Dist. LEXIS 28884, at *3 (S.D.N.Y. Nov. 17, 2005). To meet their burden of proof, Plaintiffs must do more than allege the existence of a lawful common policy or practice. Instead, they must put forth evidence "sufficient to demonstrate that plaintiffs and potential collective members were victims of a common scheme or plan *that violated the law*." *Morales v. Plantworks, Inc.*, 2006 U.S. Dist. LEXIS 4267, at *7 (S.D.N.Y. June 12, 2006) (emphasis added).  Moreover, though a common question may exist among putative collective members, the Court must determine whether that common question can be "answered without individual inquiries." *Strait v. Belcan Engineering Group, Inc.*, 2012 U.S. Dist. LEXIS 169390, at * 13 (N.D. Ill. Nov. 29, 2012).

Courts have held that conditional certification is inappropriate where the determination of a defendant's liability depends on several individual factors. *See Gillian v. Starjem Rest. Corp.*, 2011 U.S. Dist. LEXIS 115833 (S.D.N.Y. Oct. 4, 2011) (Rackoff, J.) (whether the defendant's "alleged rules violated the minimum wage and overtime provisions of the FLSA depends on the number of hours each individual worked on a particular shift, as well as the number of hours each individual worked in a particular week"); *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) (denying certification where plaintiff's claims required examination of when plaintiff and each class member was to work, when they actually worked, whether they were paid for such and whether their supervisor altered their timesheets).

2. <u>Plaintiffs Are Not Similarly Situated To Putative Collective Members With Respect To Their Off-The-Clock Claims</u>

Plaintiffs have not made the requisite factual showing that they were victims of a common policy requiring them and putative collective members to work off the clock in

11

violation of the law. It is undisputed that TCG has a facially lawful time-recording policy that prohibits employees from working off the clock. This is obviously insufficient to warrant conditional certification. Rather, Plaintiffs must allege and demonstrate that TCG maintains an *unlawful* common policy, or that MPs at each and every TCG have commonly deviated from TCG's lawful policy in the same *unlawful* manner. *Eng-Hatcher v. Sprint Nextel Corp.*, 2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) (the existence of a common presumptively legal policy does not warrant certification). Plaintiffs have failed to make such a showing.

      a.    *Plaintiffs Have Not Established A Facially or De Facto Illegal Practice Stemming From the Company's Safe and Secure Policy*

Plaintiffs first point to TCG's Safe and Secure policy to support their argument for conditional certification. However, the mere existence of this policy is not enough to warrant conditional certification because Plaintiffs have not shown that it is facially unlawful. Nor have Plaintiffs alleged that there is any common deviation from this policy that has caused a common injury to Plaintiffs and the proposed collective. Thus, Plaintiffs must show the lawful Safe and Secure policy somehow led each MP at all 48 restaurants to commonly deviate from TCG's policy requiring employees to be on the clock for all work time. Plaintiffs have not done this.

In fact, the evidence is completely to the contrary. Thirteen putative collective members from 9 TCGs attest that they were not uniformly required, or expected, to wait off the clock due to Safe and Secure, while others testify that they have never even been a part of the Safe and Secure closing team.[58] Even the exhibits cited by Plaintiffs, which fall considerably short of establishing a common unlawful deviation, demonstrate that (1) TCG did not intend Safe and Secure to result in off the clock work, (2) any off the clock wait time that resulted in a few restaurants was contrary to TCG's off the clock policy, and (3) TCG took immediate steps to

---

[58] *See* fn.39, *supra*.

eliminate and cure any deviations. None of these actions substantiate Plaintiffs' claim that Safe and Secure had the common effect of requiring putative collective members to wait off the clock or that TCG permitted managers to execute Safe and Secure in such a manner.

> b.   *Plaintiffs Have Failed To Demonstrate A Facially or De Facto Illegal Practice Stemming From Darden's Time-Keeping System*

Plaintiffs next attempt to find the requisite unlawful common policy by citing TCG's time-keeping system. Specifically, Plaintiffs complain that DASH's restrictions on employees' ability to clock in without a manager's approval in certain instances constitutes an unlawful common policy suitable for conditional certification. This assertion is unavailing. There is nothing unlawful about a time-keeping system that places restrictions on when an employee can clock in. *See Brickey v. DolgenCorp.*, 272 F.R.D. 344 (W.D.N.Y. 2011) (policies that encourage employees to report for work as scheduled do not violate the law).

Plaintiffs also fail to establish the existence of a common unlawful practice or deviation from a lawful policy in this regard. Despite Plaintiffs' claim, the evidence shows that employees are able to clock into DASH at any time, regardless of when they are scheduled.[59] If employees are not scheduled, they merely ask a manager for assistance, who will then clock in the employee and adjust the employee's clock-in time to the time when the employee states he or she commenced working.[60] There is nothing unlawful about this process.

The record is clear that certain individual Plaintiffs (but clearly not all) actually sought to prevent managers from correcting their time records by concealing the fact that they had begun working prior to clocking in, so that these Plaintiffs could maximize their ability to pick up more shifts to earn more tips by defrauding TCG.[61] Putting aside the failure to show uniformity in this

---

[59] *See* fn. 30, *supra*.
[60] *See* Section II.D.3, *supra*.
[61] Plaintiffs' submission of fraudulent time records calls into question the validity of their off-the-clock and 20%

regard, Plaintiffs' failure to follow established protocol does not create a common policy or plan warranting conditional certification. *See Holzapefel v. Town of Newburgh*, 145 F.3d 516 (2d Cir. 1998); *Joza v. Ramada Plaza Hotel*, 2010 U.S. Dist. LEXIS 94419 (E.D.N.Y. Sept. 9, 2010).

The Sixth and Tenth Circuits recently ruled on a similar issue, where the employer had a procedure for employees to report and correct payroll errors, of which the plaintiff was aware, but chose not to follow. *White v. Baptist Mem'l Health Care Corp.*, 2012 U.S. App. LEXIS 22752 (6th Cir. Nov. 6, 2012); *Brown v. ScriptPro, LLC*, 2012 U.S. App. LEXIS 24364 (10th Cir. Nov. 27, 2012). In *White*, the Court affirmed decertification of the plaintiff's FLSA claims, holding that "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." *Id.* at *13. In *Brown*, the Court affirmed summary judgment for the defendant on the plaintiff's FLSA claim, holding that "where the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation." *Id.* at *20. Likewise, TCG has a protocol by which employees can report uncompensated work time. Plaintiffs admit they were aware of this protocol, that they were compensated for all time when they followed it, and that any time worked off the clock was the result of their own deliberate deviation from TCG's time-recording policies, not from any unlawful policy or practice of TCG. As such, certification is improper.[62]

      *c.*     *Plaintiffs Have Failed To Demonstrate A Facially or De Facto Illegal Practice With Respect To Overtime*

Plaintiffs next appear to rely upon TCG's labor hours matrix to support their bid for conditional certification on their overtime claim. However, the mere existence of a labor

---

Rule claims and impairs the Court's ability to determine the existence of Defendants' alleged liability. That Plaintiffs now seek to recover compensation for their own deliberate and improper conduct should disqualify them from acting as collective representatives. *See Seever v. Carrols Corp.*, 528 F. Supp. 2d 159 (W.D.N.Y. 2007).
[62] *See* fn. 2, *supra*.

allocation policy is insufficient to establish conditional certification. *Brickey*, 272 F.R.D. at 348.

In *Brickey*, the plaintiffs claimed that the defendant knew or should have known that if it created an incentive for managers to stay within their labor hours budget, managers would falsify their employees' time records. *Id.* at 347-48. The *Brickey* plaintiffs offered some evidence that certain managers flouted the defendant's time reporting policy; however, certification was deemed inappropriate because the plaintiffs failed to show "that such activity was widespread or common practice, or that the managers did so because they were instructed, compelled, forced, or encouraged to do so by other [employer] policies." *Id.* at 348.[63]

Likewise, here, Plaintiffs have failed to provide any evidence of a common policy or plan requiring employees to work uncompensated overtime, or that any manager was instructed, forced, or encouraged to under-report employees' hours. Being aware of the costs of overtime and properly allocating labor hours based on the needs of the restaurant is by no means unlawful. Applying *Brickey*, therefore, TCG's labor hours matrix does not support conditional certification.

       *d.*      *Conditional Certification Is Improper On Plaintiffs' Off-The-Clock Claims*

Conditional certification of Plaintiffs' off-the-clock claims should also be denied because Plaintiffs cannot specify the nature and extent of the alleged violations. Those Plaintiffs who testified regarding alleged off-the-clock violations confessed that they do not know how long they allegedly worked off the clock, or when, or how frequently.[64] In fact, when reviewing their time records, Plaintiffs are unable to declare whether a seemingly late clock in or a seemingly early clock out was for a lawful reason, like arriving to work late or leaving early for a legitimate

---

[63] Plaintiffs' counsel are aware of this case, as they represented the plaintiffs in that action.

[64] **Ex. 3**, Beng Tr. 90:17-91:8; **Ex. 5**, Benzion Tr. 111:11-17; **Ex. 4**, Boreland Tr. 63:22-64:5; **Ex. 69**, Ahmed Chhab Deposition, 199:4-22; **Ex. 35**, Oliver Tr. 92:7-13; **Ex. 2**, Rella Tr. 173:17-174:5; **Ex. 70**, DaJuan White Deposition 235:9-20.

reason.[65] As such, liability cannot possibly be determined on a universal basis. Rather, liability

hinges on the specific individualized circumstances of each Plaintiff's employment. Moreover,

the existence and scope of Plaintiffs' alleged injuries cannot be ascertained by looking at their

time records. Shift start times and end times vary from shift to shift, day to day, season to season,

and restaurant to restaurant.[66]   The individualized inquiries required to determine whether

liability exists as to any collective member, coupled with the fact that an overwhelming number

of collective members have never worked off the clock or been encouraged to do so,[67] renders

conditional certification inappropriate. *See Gillian,* 2011 U.S. Dist. LEXIS 115833, at * 17.

> 3.   Plaintiffs Are Not Similarly Situated To Putative Collective Members With Respect To Their Tip Share Claims

Plaintiffs' argument for nationwide conditional certification of their tip share-related

claims fails on its face. Plaintiffs allege that tipping out to ineligible employees was required at

"most TCG locations" (*See* Plaintiffs' Motion, p. 7). Thus, even Plaintiffs admit that there is no

common policy or practice regarding tip share, rendering *nationwide* Servers and Bartenders to

be similarly situated. [68] It is not enough for Plaintiffs to allege that polishers and Dishwashers

received tips "in most TCG locations." Rather, Plaintiffs must show these allegedly ineligible

employees received tips at *all locations*, and *at the direction of management. Turner v.*

*Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951, 945-55 (N.D. Ill. 2011) (no unlawful

policy where tips were voluntarily shared and were not mandated by the restaurant); DOL FIELD

---

[65] **Ex. 2**, Rella Tr. 79:14-24; **Ex. 68**,  Mitchell Tr. 188:22-189:16.

[66] **Ex. 43**, Martino Dec. ¶¶12, 15; **Ex. 32**, Zipper Dec. ¶7; **Ex. 28**, Villani Dec. ¶¶7, 12; **Ex. 48**, Martin Dec. ¶13; **Ex. 38**, Keefover Dec. ¶5; **Ex. 50**, Stoetzer Dec. ¶6; **Ex. 71**, Declaration of Stephanie Garrett ("Garrett Dec.") ¶6; **Ex. 44**, Scheerle Dec. ¶5; **Ex. 42**, Perez Dec. ¶4; **Ex. 26**, Mendieta Dec. ¶4; **Ex. 56**, Miceli Dec. ¶15; **Ex. 38**, Webb Dec. ¶16; **Ex. 63**, Hassinger Dec. ¶7; **Ex. 73**, Declaration of Angela Nowland ("Nowland Dec.") ¶¶ 5-7.

[67] **Ex. 50**, Stoetzer Dec. ¶4; **Ex. 45**, Cain Dec. ¶8; **Ex. 47**, Reyes Dec. ¶7; **Ex. 27**, Fields Dec. ¶5; **Ex. 32**, Zipper Dec. ¶11; **Ex. 59**, Martorella Dec. ¶9; **Ex. 42**, Perez Dec. ¶7; **Ex. 26**, Mendieta Dec. ¶8; **Ex. 38**, Webb Dec. ¶7; **Ex. 37**, Lazo Dec. ¶7; **Ex. 25**, Maas Dec. ¶5; **Ex. 63**, Hassinger Dec. ¶4; **Ex. 28**, Villani Dec. ¶19.

[68] Notably, Plaintiffs have not shown or alleged that UTS (November 14, 2011-present) includes any ineligible employees in the tip pool; thus, Plaintiffs have limited their tip share-related claims to that portion of the FLSA period prior to November 14, 2011. Plaintiffs' claims for this period nevertheless fail given that they have neglected to establish a common policy or plan to include ineligible employees in tip share throughout all TCG restaurants.

OPERATIONS HANDBOOK § 30d04(c) ("It does not appear that the Congress, even in requiring as a general principle that tipped employees retain all their tips, intended to prevent tipped employees from ... sharing [their tips] with whichever coworkers they please.")

Plaintiffs have not even shown that each TCG location had an individual performing polishing duties during the FLSA period. Testimony from 8 putative collective members from 6 locations establishes quite clearly that there is no uniformity as to whether restaurants even maintained a polisher.[69]  Furthermore, Plaintiffs have not shown that there was a TCG-wide common policy or plan requiring polishers to receive tips, or that, in the few locations where a polisher was tipped out by some employees, the practice was mandated by management. Here, the only demonstrative evidence[70] submitted by Plaintiffs shows that TCG took measures to *prevent* Servers and Bartenders from tipping out polishers; not to require it.  Moreover, putative collective members have testified that if they tipped out a polisher, it was voluntary.[71]

Plaintiffs also seek conditional certification of their tip share claim based on the alleged practice of tipping out Dishwashers prior to November 14, 2011. Certification of this aspect of Plaintiffs' claim is unwarranted because, again, there is no uniformity among TCG restaurants. Indeed, testimony from Plaintiffs and putative collective members establishes that the practice of tipping out Dishwashers was limited to only one TCG location – 42nd St. – where the practice was voluntarily instituted by Servers and continued despite an express directive by management to stop the practice. There is no basis upon which to certify a collective in this regard.

4.    Plaintiffs Are Not Similarly Situated To Putative Collective Members With Respect To Their Side Work Claim[72]

---

[69] *See* fn. 24, *supra*.
[70] Exhibit LL to Plaintiffs' Motion, D0050918-20.  These December of 2010 emails from Directors of Operations, advise MPs that if they have the position of silverware polisher in their restaurant, those individuals should be not be included in any tip sharing.
[71] *See* fn. 25, *supra*.
[72] Defendants challenge the validity of the 20% limit. There is no basis in the FLSA or its regulations for the

Plaintiffs claim that they and putative collective members uniformly spent more than 20% of their weekly work time engaged in non-tip producing work,[73] and therefore must be paid at the full minimum wage for such time (as opposed to the tipped minimum wage).[74] *See Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872 (8th Cir. 2011), *cert denied*, 132 S. Ct. 1094 (2012) (accepting the 20% threshold in the U.S. Department of Labor's Field Operations Handbook).[75]

There are two time periods relevant to Plaintiffs' claims involving side work. Prior to November 14, 2011, each TCG location maintained individual side work policies. On November 14, 2011, the Company enacted its USW policy as a guideline for MPs to assign side work.[76]

>    a.    *Plaintiffs Have Not Shown There Was A Common Side Work Policy Prior To November 2011, Nor That Each Restaurant's Policy Was Unlawful*

Conditional certification of this claim for the time period prior to November 14, 2011 is improper because Plaintiffs have not shown that they are similarly situated to the putative collective with respect to TCG's PUSW policies. Prior to November 2011, each individual TCG location had its own unique side work policy.[77] Moreover, each location's side work policy was lawful, and each MP understood that putative collective members' side work assignments should not take more than 30 minutes per shift, well within the 20% threshold.[78] These facts establish

---

proposition that the tip credit is subject to a 20% cap on certain duties that make up a tipped occupation. This limit was inexplicably born from the U.S. Department of Labor's Field Operations Handbook, Section 30d00(e), and is plainly at odds with the statute, which provides the only qualitative limit for the application of the tip credit is that tipped employees receive no less than the full minimum wage through a combination of their cash wage and tips.

[73] The determination as to whether employees have spent more than 20% of their time on related non-tip producing work is based on the time worked for the week. *See* U.S. Department of Labor Fact Sheet, No. 15, at 2.

[74] Plaintiff's assertion that some of the duties assigned to Servers and Bartenders qualify as "unrelated" tip-producing work for which the full minimum wage must be paid is not supported by the record. Indeed, there is no evidence that putative collective members even do the work Plaintiffs allege are "unrelated" (like cleaning the bathroom). For that reason, it is not surprising that Plaintiffs fail to cite to any part of the record upon making this unsubstantiated allegation.

[75] Defendants submit that the 8th Circuit's reliance on the 20% cap found in the Field Operations Handbook was without basis in law, and notes that the Second Circuit has not addressed *Fast* or adopted the 20% cap on tipped employees performing duties making up part of a tipped occupation.

[76] *See* Section II.B, *supra.*

[77] *See* fn. 14, *supra.*

[78] **Ex. 14**, Calkins Dec. ¶19; **Ex. 36**, Dickstein Dec. ¶22; **Ex. 19**, Hickey Dec. ¶9; **Ex. 24**, Icken Dec. ¶20; **Ex. 20**, Amman Dec. ¶27; **Ex. 11**, Kelly Dec. ¶25; **Ex. 21**, Leigh Dec. ¶24.

that there was no common illegality from restaurant to restaurant.

      *b.*    *Plaintiffs Have Not Shown That The USW Policy Is Unlawful*

Collective treatment is likewise inappropriate for the post-November 14, 2011 time period, when the concept of USW was introduced. There is nothing facially unlawful about the policy. To the contrary, the policy itself expressly requires that no employee spend more than 20% of his shift engaged in non-tip-producing side work, and even divides tasks into tip-producing and arguably non-tip producing categories to ensure that MPs stay compliant with TCG's legal obligations. Thus, to obtain conditional certification, Plaintiffs must demonstrate that management at each TCG deviated from this lawful policy in the same way and caused a common injury to thousands of employees at 48 TCG locations. Plaintiffs have not provided any evidence in support of this conclusion, and their motion thus should be denied.

      *c.*    *Plaintiffs and Putative Collective Members Are Not Similarly Situated In Connection With A Claim Under The 20% Rule*

Plaintiffs can only be similarly situated to those putative collective members who spend more than 20% of their weekly work time engaged in non-tip producing work and are paid less than the full minimum wage. A review of the record establishes that there is no uniformity in either respect. First, numerous putative collective members have attested to the fact that they have never spent more than 20% of their work time on non-tip producing side work.[79] Therefore, these individuals do not have a claim under the 20% Rule. Second, in at least 5 locations, TCG pays its Servers and Bartenders no less than the full minimum wage.[80] As such, putative collective members in those locations have no claim regarding the 20% Rule because even if they spend more than 20% of work time on non-tip producing work (which they do not), they are not aggrieved.  Because there is no commonality under both criteria, Plaintiffs are not similarly

---

[79] *See* fn. 22, *supra.*
[80] Troy, MI, Minneapolis, MN, Costa Mesa, CA, Los Angeles, CA, and Las Vegas, NV; *see* Section II.A.3, *supra.*

situated to all putative collective members in connection with their 20% Rule claim.

        *d.*     *Individualized Differences Make It Impossible To Show Common Proof*

      Whether speaking of PUSW or USW, the conclusion is the same. Conditional certification of Plaintiffs' 20% Rule claim should be denied as to both time periods because the determination of whether a putative collective member is entitled to any relief in this respect requires an individualized inquiry into two very specific areas: (1) each member's total time worked per week and (2) the total length of time each member spent on non-tip producing work during that particular week. It is uncontroverted that numerous factors contribute to how long a shift could last, including but not limited to, the shift (breakfast, lunch, or dinner), day of the week, time of the year, when the first guest is seated, when the final guests leeaves, whether the member opened the shift, whether the member closed the shift, the location's hours, and the staffing level.[81] Similarly, many factors influence how many minutes a member may spend on non-tip producing side work, including but not limited to, the shift (breakfast, lunch or, dinner), whether the member was assigned opening side work, whether the member was assigned closing side work, day of the week, member's experience/skill, locations' staffing level, side work completed on the prior shift, nature of the side work, and number of assignments per day.[82]

      Therefore, whether an employee spends more than 20% of her weekly work time performing non-tip producing side work will necessarily require a very specific, highly factual, and inherently individualized investigation into each putative class member's shifts, days, and work weeks. For example, four hours of non-tip-producing side work would surpass the 20% threshold in a work week of 16 hours, but would be perfectly lawful in a work week of 20 hours.

---

[81] *See* fn. 49, *supra*
[82] **Ex. 28**, Villani Dec. ¶¶9-10; **Ex. 48**, Martin Dec. ¶¶10, 12; **Ex. 49**, Mayer Dec. ¶11; **Ex. 50**, Stoetzer Dec. ¶8; **Ex. 43**, Martino Dec. ¶¶9-10; **Ex. 32**, Zipper Dec. ¶16; **Ex. 27**, Fields Dec. ¶13; **Ex. 44**, Scheerle Dec. ¶10; **Ex. 47**, Reyes Dec. ¶10; **Ex. 45**, Cain Dec. ¶12; **Ex. 55**, Van Wie Dec. ¶¶10-13; **Ex. 59**, Martorella Dec. ¶12-14; **Ex. 42**, Perez Dec. ¶10; **Ex. 56**, Miceli Dec. ¶11; **Ex. 38**, Webb Dec. ¶12; **Ex. 37**, Lazo Dec. ¶11; **Ex. 46**, Currier Dec. ¶10.

Thus, the day-to-day (and ultimately week-to-week) differences in employees' length of shifts within each restaurant have a significant, and highly fact-specific, impact on the applicability of the 20% Rule. No two work weeks (including the nature of the side work performed) are the same within the same restaurant, much less throughout 48 restaurants.

Given both the inherent individualized differences in the amount of side work performed each day, and each week, by the putative collective members, and the fact that each shift is a different duration, the only way to realistically determine if the 20% threshold was exceeded is by virtue of conducting a person by person, day by day, week by week analysis.[83]

Conditional certification is inappropriate where liability is dependent on so many individual factual assessments, even if the plaintiffs are subject to a common question. *See, e.g., Strait*, 2012 U.S. Dist. LEXIS 169390. In *Strait*, the court denied conditional certification of the plaintiffs' overtime wage claim because in order to address whether the plaintiffs were properly classified was common, the Court had to conduct individualized inquiries into each plaintiffs' actual daily duties. 2012 U.S. Dist. LEXIS 169390, at *13-14. Likewise, here, Plaintiffs assert that there is a common question as to whether putative collective members spent more than 20% of their time on non-tipped work, but this question cannot be answered without inquiring into each individual's daily tasks, and how much time they devote to those tasks on a shift by shift basis. Conditional certification of Plaintiffs' 20% Rule claims must therefore be denied.

5.     Plaintiffs Case Law Regarding the 20% Claim Is Inapposite

The cases primarily relied upon by Plaintiffs to support nationwide certification of the 20% claim, *Fast v. Applebee's Int'l* and *Driver v. AppleIllinois*, are distinguishable. In both, the

---

[83] Plaintiffs cannot show that they are similarly situated with respect to the 20% Rule because their evidence of their purposeful misrepresentation of their time records renders impossible a determination of whether the 20% threshold has been met on a class-wide basis. Plaintiffs do not know when they worked off the clock, nor for how long, and thus cannot establish what percentage of their weekly work time was spent doing side work on an individual – much less collective-wide – basis.

plaintiffs' 20% claim arose out of a memorandum entitled "Labor Management Best Practices," which specifically provided for shifting non-service, BOH related duties to the FOH tipped staff to achieve labor savings. *Fast*, 243 F.R.D. 360, 361-62; *Driver*, 2012 U.S. Dist. LEXIS 1213312, at *22-23 (N.D. Ill. Aug. 27, 2012). Thus, there was a *facially unlawful* common policy of using tipped employees in a non-tipped capacity for significant amounts of time without paying them minimum wage. In *Driver*, the restaurant's corporate meeting minutes estimated savings of $70,000 per year if certain locations used its employees to perform all cleaning. 2012 U.S. Dist. LEXIS 1213312, at *27-28. In *Fast*, the Department of Labor had already determined that BOH non-service related duties were being improperly shifted in multiple locations. 43 F.R.D. at 364.

Here, TCG has no common policy related to the 20% Rule that is facially unlawful. Prior to November 2011, there was no single best practice for side work at TCG restaurants. Indeed, each restaurant had its own individual side work policy.[84] Furthermore, there is no evidence that the intention, express or implied, of any of the 44 then-existing side work policies was to shift non-service related duties to the FOH staff to achieve cost savings.  Also, to the extent that USW created a more uniform side work policy, that policy is facially lawful and does not purport, in any way, to create labor savings by pushing more non-tip producing work onto FOH employees.

*Morris v. Lettire Constr. Corp.*, 2012 U.S. Dist. LEXIS 134860 (S.D.N.Y. Sept. 18, 2012) is also distinguishable. There, the defendant centrally operated and controlled all of its sites.  When one plaintiff complained to the CEO about not being paid overtime, the CEO replied "That's not how we do it," an admission supporting the common nature of the plaintiffs' claim. This case is inapplicable because, although TCG provides MPs with general performance standards and training, TCG does not centrally operate each of the 48 restaurants. Each MP has broad authority to operate his or her restaurant as he or she deems appropriate. In other words,

---

[84] *See* fn. 14, *supra*.

22

MPs are guided by TCG policies, but individual implementation varies among restaurants. The Plaintiffs have not provided a single piece of evidence to suggest, let alone prove, that TCG imposed any *unlawful* common policies on all of its locations.

Finally, *Stevens v. HMSHost Corp.*, 2012 WL 4801784, at \*3 (E.D.N.Y. Oct. 10, 2012), is also distinguishable. In *Stevens,* each plaintiff had the same job description, and was subject to the same company-wide pay policies as the putative collective members. Here, each Plaintiff testified that his/her duties varied from day to day, shift to shift, and restaurant to restaurant. Plaintiffs also testified to material differences in the length of their shifts, side work duties, and the time to complete their side work. Moreover, putative collective members have attested that they never spent more than 20% of any shift on non-tip producing work. In short, Plaintiffs have not testified to any nationwide unlawful common policy, and reliance on *Stevens* is misplaced.

**B.      Plaintiff's Proposed Notice and Related Requests Should Be Denied**

Although TCG maintains that Plaintiffs' Motion should be denied, it must also be noted that Plaintiffs' proposed notice, posting request, and reminder notice request far exceed what is necessary and typically sufficient to accomplish the goals of a 216(b) notice.

1.      The Proposed Notice is Materially Deficient

First, Plaintiffs' proposed 90-day opt-in period is unnecessary. Courts authorize a 60-day opt-in period absent special circumstances, and no such circumstances exist here. *Diaz v. S&H Bondi's Dept. Store, Inc.*, 2012 U.S. Dist. LEXIS 5683, at \*8 (S.D.N.Y. Jan. 17, 2012).

Second, the Court should strike "Court Authorized Notice" from the top of the proposed notice, as it conveys the impression that the Court has endorsed the lawsuit. *See Hernandez v. Merrill Lynch & Co.,* 2012 U.S. Dist. LEXIS 49822, at \*21 (S.D.N.Y. April 6, 2012).

Third, the scope of the employees to receive notice is improperly defined. Plaintiffs seek to send notice to all Servers and Bartenders employed at any TCG since November 17, 2008,

even though each putative collective member's claim can date back, at most, to three years prior to the filing of his or her consent form. *See In re Penthouse Exec. Club Comp. Litig.*, 2010 U.S. Dist. LEXIS 114743, at *17 (S.D.N.Y. Oct. 27, 2010) (Buchwald, J.).   As such, Plaintiffs are entitled to send notices to only those putative collective members employed from three years back from the date the notice is mailed, plus the additional agreed 90 days of tolling.

Fourth, Plaintiffs' notice uses larger font, bold typeface, and underlining to specifically highlight the language that promotes joining the lawsuit.   This emphasis on such selective language is improper.  All language in the notice is important and should be treated as such.

Fifth, Plaintiffs' proposed notice contains duplicative language. (*See*, the first three bullet points on pages 1-2 and "What is this lawsuit about?" section on page 2, Plaintiffs' counsel's contact information on each page, etc.).  Such repetition is promotional and overly influential.

Lastly, Plaintiffs' proposed notice is improper because it directs potential collective members to contact only Plaintiffs' counsel with any questions.  Defendants' counsel should also be listed in the notice as a source of information. *Diaz*, 2012 U.S. Dist. LEXIS 5683 at *8.

Defendants have attached hereto as Exhibit 74 its counter-proposed notice, which is substantially similar to a notice this Court has authorized.

### 2.   Plaintiffs' Request To Post Notice In TCG Locations Should Be Denied

Posting notice is not necessary where defendants provide sufficient contact information for potential collective members. *Hernandez*, 2012 U.S. Dist. LEXIS 49822, at *21.  Moreover, the only group that will be reached by a posting are TCG's current employees.  Those current employees will receive the very same notice by mail.  There is no reason to assume that TCG will not have up-to-date mailing addresses for their current employees.  Accordingly, first class mail is the best way to provide notice to potential class members. *Hintergerger v. Catholic Health Sys.*, 2009 U.S. Dist. LEXIS 97944, at *41-42 (W.D.N.Y. Oct. 21, 2009); *Shajan v.*

*Barolo, Ltd.*, 2010 U.S. Dist. LEXIS 54581, at *5 (S.D.N.Y. June 2, 2010).

       3.      <u>Plaintiffs' Request To Send A Reminder Notice Should Be Denied</u>

The notice informs potential collective members of their rights. A reminder notice will only be viewed as an endorsement by the Court for putative collective members to join the lawsuit. *See e.g, Guzelgurgenli v. Prime Time Specials, Inc.,* 2012 U.S. Dist. LEXIS 113212, at * (E.D.N.Y. Aug. 8, 2012); *Knispel v. Chrysler Group LLC,* 2012 U.S. Dist. LEXIS 21188, at *21-22 (E.D. Mich. Feb. 21, 2012) (both denying request for reminder notice).

       4.      <u>Plaintiffs' Request For Emails and Telephone Numbers Should Be Denied</u>

The Court should deny Plaintiffs' request for the emails and telephone numbers of potential collective members. TCG does not keep the email addresses of all of its tipped staff. Further, the production of telephone numbers is unnecessary at this stage. Plaintiffs will have the names and addresses of putative collective members. To provide more information will only allow Plaintiffs and their counsel to solicit putative class members. Plaintiffs may request emails and phone numbers directly from putative collective members on the consent to join form.

**C.    Equitable Tolling Should Be Denied**

Plaintiffs' request for equitable tolling should be denied, as the time engaged in motion practice does not meet the Second Circuit standard of a situation "where a plaintiff could show that it would have been impossible for a reasonably prudent person to learn about his or her cause of action." *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2006); *Hinterberger*, 2009 U.S. Dist. LEXIS 97944, at *47-48 (denying equitable tolling).

**D.    Conclusion**

For the reasons stated in this Memorandum, Defendants respectfully request that Plaintiffs' Motion for Conditional Certification be denied.