UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
AHMED CHHAB, KATHRYN SHRADER, LANCE
FELDHUN, MICHAEL RELLA, VINENT ANTHONY
BORELAND, and ADRIANNE BENZION, on behalf
of themselves and all others similarly
situated,

                        Plaintiffs,

        - against -

DARDEN RESTAURANTS, INC., GMRI, INC.,
CAPITAL GRILLE HOLDINGS, INC. d/b/a THE
CAPITAL GRILLE, and RARE HOSPITALITY
INTERNATIONAL, INC.,

                    Defendants.
---------------------------------------X

**MEMORANDUM AND ORDER**

11 Civ. 8345 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Ahmed Chhab, Kathryn Shrader, Lance Feldhun, Michael Rella, Vincent Anthony Boreland, and Adrianna Benzion (collectively, "plaintiffs") bring this action under the Fair Labor Standards Act (the "FLSA"). In the instant motion, plaintiffs request that this Court: (1) authorize the distribution of a collective action notice to a class of potential opt-in plaintiffs; (2) approve plaintiffs' proposed notice of lawsuit, opt-in consent form, and deadline reminder letter; and (3) direct the defendants to disclose the names, work locations, dates of employment, addresses, phone numbers, and email addresses of potential opt-in plaintiffs. For the reasons set forth below, plaintiffs' motion is granted in part and denied in part.

**BACKGROUND**[1]

## I. Factual Background

Plaintiffs work or have worked as servers and bartenders ("tipped employees"[2]) at The Capital Grille ("TCG"), a well-known chain of restaurants with forty-seven locations across the United States.  Defendant Darden Restaurants, Inc. ("Darden") is a publicly traded company that owns and operates all TCG locations, as well as over 1,900 other restaurant chains including Red Lobster, The Olive Garden, Bahama Breeze, and Longhorn Steakhouse.[3]

According to plaintiffs, Darden maintains significant control "down to the smallest detail" over each of its TCG restaurants to ensure their adherence with its uniform policies. (Deposition of Brian Foye, Fitapelli Decl. Ex. B ("Foye Tr."),

---

[1]    The background is derived from the Class and Collective Action Complaint ("Compl."), filed November 17, 2011; Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Certification Pursuant to the Fair Labor Standards Act, for Court-Authorized Notice to Similarly Situated Persons, and for Expedited Discovery, filed November 5, 2012 ("Pl. Mem."); the Declaration of Joseph A. Fitapelli, Esq. in Support of Plaintiffs' Motion for Preliminary Certification ("Fitapelli Decl."), filed November 5, 2012, and the exhibits annexed thereto; Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Certification Pursuant to the Fair Labor Standards Act, for Court-Authorized Notice to Similarly Situated Persons, and for Expedited Discovery, filed December 17, 2012 ("Def. Opp."); the Declaration of Craig R. Benson in Opposition to Plaintiffs' Motion for Preliminary Certification ("Benson Decl."), filed December 17, 2012, and the exhibits annexed thereto; and the Reply Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Certification, filed January 16, 2013 ("Pl. Reply Mem.") and the exhibits annexed thereto.
[2]    Under the FLSA, a "tipped employee" is one who customarily and regularly receives more than $30 in tips per month.  See 29 U.S.C. § 203(t).
[3]    Plaintiffs also bring FLSA claims against GMRI, Inc. ("GMRI"), a direct subsidiary of Darden, and RARE Hospitality International, Inc. ("RARE"), a subsidiary of GMRI that owned and operated TCG locations before being sold to Darden.  (Compl. ¶¶ 5, 64-71, 80-86.)

at 134:23-24, 182:24-183:13.)  It selects managing partners ("MP") to manage its individual TCG locations, each of whom report to one of seven regional Directors of Operations ("DO"), who in turn report to a single Senior Vice President of Operations.  (Foye Tr. at 13:25-14:16.)  By utilizing this network of managing employees, Darden is able to communicate directly with individual TCG locations to implement nationwide policies, manage menu and service specifications, and deliver training, finance and payroll information.  (See July 2012 Form 10-K, Fitapelli Decl. Ex. C, at 7; see also Foye Tr. at 16:17-17:14, 225:13-19.)

Plaintiffs rely on Darden's acknowledgment that it provides extensive training to its TCG employees, evidencing its commitment to consistency and uniformity across TCG locations. (July 2012 Form 10-K, Fitapelli Decl. Ex. C, at 7 ("Restaurants are visited regularly by all levels of supervision to help ensure strict adherence to all aspects of our standards.  Our Learning Center of Excellence in partnership with each brand's head of training, together with senior operations executives, are responsible for developing and maintaining our operations training programs.")  Each MP attends the manager-in-training program at "Darden University," as well as a week of standardized training at Darden's corporate support center in Orlando.  (See Foye Tr. at 54:6-9; Deposition of Thomas Gathers,

3

Fitapelli Decl. Ex. E ("Gathers Tr."), at 109:21-112:21.) TCG employees confirm that such training is standardized, designed to ensure that all locations adhere to the same policies and procedures. (See Gathers Tr. at 90:12-22.) MPs "cannot change policy" at TCG. (Foye Tr. at 165:16-18.)

TCG's tipped employees are trained at their respective restaurants by "certified trainers," hourly employees from other locations who have been selected by Darden based on their MPs' recommendations and who are themselves taught to provide such training. (Id. at 36:2-9; Gathers Tr. at 56:8-11, 58:19-59:5; Deposition of Jill Dickstein, Fitapelli Decl. Ex. F ("Dickstein Tr."), at 252:23-253:16.) The certified trainers provide tipped employees with standardized training materials, including a server and bartender manual, a member handbook, and a payroll guide. (See Foye Tr. at 43:6-19; Gathers Tr. at 52:11-22.) Notably, once they have been trained by certified trainers, tipped employees are permitted to transfer from one TCG location to another without undergoing further training, since the policies in which they have been trained are "essentially identical" at each location. (Deposition of Ahmed Chhab, Fitapelli Decl. Ex. K ("Chhab Tr."), at 128:9-20; Deposition of DuJuan White, Fitapelli Decl. Ex. L ("White Tr."), at 21:19-22; Deposition of Crystal Beng, Fitapelli Decl. Ex. M ("Beng Tr."),

at 34:10-18; Deposition of Tasiya Oliver, Fitapelli Decl. Ex. N ("Oliver Tr."), at 10:21-25, 18:1-9.)

Plaintiffs further claim that Darden mandates the implementation of certain standardized programs in all TCG locations nationwide. (July 2012 Form 10-K, Fitapelli Decl. Ex. C, at 9.) For example, each TCG location must use the Darden Application for Service and Hospitality ("DASH"), TCG's proprietary timekeeping system; the Darden Information Super Highway ("DiSH"), which provides access to payroll information and various Darden publications; the Labor Management System ("LMS"), TCG's shift scheduling system; and the Par Pull System, which measures food preparation requirements. (Pl. Mem. at 3-4.)

In reliance on the foregoing, plaintiffs move for conditional class certification, claiming that defendants have violated the FLSA in connection with four common policies affecting TCG's tipped employees nationwide: side work, tip pooling, uncompensated off-the-clock hours, and denial of overtime pay. We summarize each of those claims below.

**A. Federal Tip Credit and Side Work**

The FLSA generally requires employers to pay employees a federal minimum wage of $7.25 per hour. <u>See</u> 29 U.S.C. § 206(a)(1). However, under the statute's "tip credit," employers may pay tipped employees at an hourly wage rate below the

minimum wage, provided that the hourly wage and the employees' tips, taken together, are at least equivalent to the minimum wage.  See 29 U.S.C. § 203(m).[4]

When an employee is employed by a single employer in both a tipped and a non-tipped position, DOL regulations permit the employer to utilize the tip credit only for hours spent by the employee in the tipped occupation.  See 29 C.F.R. §§ 531.51. Thus, if a tipped employee works two jobs, one in which his work customarily and regularly produces tips and one in which it does not, the employee is considered employed in dual occupations, and the tip credit may not be taken for any hours worked in the non-tip-producing occupation.  See id. § 531.56(e).  However, the regulation distinguishes that situation from "a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses," concluding that "[s]uch related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips."  Id.

In the case of servers and bartenders, the threshold between tip-producing and non-tip-producing work is particularly important.  Waitstaff commonly perform "side work," such as setting and clearing tables, that is related to their tipped

---

[4] Under section 203(m), the minimum required cash wage that an employer can pay a tipped employee is $2.13 per hour, so the maximum tip credit that the employer can claim per employee is $5.12 per hour.

occupation but does not itself generate tips. In such circumstances, the DOL has stated that an employer can "take the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e. maintenance and preparatory or closing activities)," but that such duties must be "incidental to the regular duties of the server." DOL Field Operations Handbook § 30d00(e) (rev. June 30, 2000), available at http://www.dol.gov/whd/FOH/FOH_Ch30.pdf (last visited Sept. 13, 2013). The DOL further clarified this issue in a March 2011 opinion in which it concluded that tipped employees who spend a substantial amount of time, or more than twenty percent of their workweeks, engaged in related but non-tip-producing work must be paid the full minimum wage for the time spent performing the non-tipped work. See U.S. Department of Labor, Wage and Hour Division Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. Mar. 2011) ("DOL Fact Sheet #15"), available at http://www.dol.gov/whd/regs/compliance/whdfs15.pdf (last visited September 3, 2013). While not expressly mandated in the DOL regulations, certain courts have concluded that the twenty percent limit on side work under the federal tip credit is entitled to deference. See, e.g., Fast v. Applebee's International, Inc., 638 F.3d 872, 879-81 (8th Cir. 2011);

<u>Driver v. AppleIllinois, LLC</u>, 890 F. Supp. 2d 1008, 1032-33 (N.D. Ill. 2012).

Plaintiffs allege that, during the relevant period, defendants uniformly required tipped employees to perform a substantial amount of side work, or non-tip-producing duties, in excess of twenty percent of their shift. Nevertheless, plaintiffs assert that defendants unlawfully utilized the FLSA tip credit wage rate for the excessive hours spent on side work. (<u>See</u> Pl. Mem. at 6-7.) As explained below, plaintiffs' side work allegations differ slightly for the periods before and after November 2011, when Darden implemented a uniform side work policy in all of its TCG locations.

**1. Pre-November 2011 TCG Side Work**

Prior to November 2011, each TCG location circulated general side work guidelines containing lists of the side work tasks to be completed by tipped employees at those locations. (<u>See, e.g.</u>, New York – 42nd Street Side Work Guidelines, Fitapelli Decl. Ex. T; New York – 51st Street Side Work Guidelines, Fitapelli Decl. Ex. U; New York – Wall Street Side Work Guidelines, Fitapelli Decl. Ex. V; Indianapolis, Indiana Side Work Guidelines, Fitapelli Decl. Ex. Y; Charlotte, North Carolina Side Work Guidelines, Fitapelli Decl. Ex. Z; Phoenix, Arizona Side Work Guidelines, Fitapelli Decl. Ex. AA.)

Those guidelines divided the requisite side work into opening, closing, and running side work tasks. Opening side work, such as folding napkins, polishing glasses and silverware, cutting and wrapping lemon wedges, and filling butter ramekins, was required to be completed before the start of lunch and dinner services. (See Chhab Tr. at 155:2-7; White Tr. at 151:2-19, 152:9-18; Beng. Tr. at 122:5-21; Deposition of Amy Mitchell, Fitapelli Decl. Ex. DD ("Mitchell Tr."), at 133:17-23, 135:2-11; Deposition of Michael Rella, Fitapelli Decl. Ex. EE ("Rella Tr."), at 159:4-22.) Closing side work, such as running used glasses and steak knives through the dishwasher, creating "setups" of washed and polished silverware, cleaning the coffee machines, and restocking coffee beans and tea bags, was required to be completed at the end of service, before the restaurants closed each night. (See Chhab Tr. at 172:4-173:21; White Tr. at 174:8-17, 183:5-18; Oliver Tr. at 69:9-16; Rella Tr. at 155:23-157:8, 160:11-161:18; Deposition of Vincent Anthony Boreland, Fitapelli Decl. Ex. FF ("Boreland Tr."), at 132:12-22; Deposition of Kathryn Shrader, Fitapelli Decl. Ex. HH ("Shrader Tr."), at 93:7-19, 95:2-9, 97:12-98:24, 101:4-21.) Opening and closing side work tasks were divided among the tipped employees by station. (See Chhab Tr. at 184:16-23; White Tr. at 134:11-135:3; Rella Tr. at 130:15-131:15; Mitchell Tr. at 132:18-133:1.) Running side work, which tipped employees were required

to complete throughout their shifts, included brewing coffee and tea, polishing and replacing clean silverware, restocking clean dishes, cleaning counters, and refilling ice bins.  (See, e.g., New York – 42nd Street Side Work Guidelines, Fitapelli Decl. Ex. T; New York – 51st Street Side Work Guidelines, Fitapelli Decl. Ex. U; Charlotte, North Carolina Side Work Guidelines, Fitapelli Decl. Ex. Z; Phoenix, Arizona Side Work Guidelines, Fitapelli Decl. Ex. AA.)

Plaintiffs claim that although they spent a substantial amount of time, in excess of twenty percent of their shifts, performing opening and closing side work duties, defendants failed to pay them for that time at the full minimum wage rate. (See Foye Tr. at 87:11-13.)  Several plaintiffs have testified that opening side work duties alone often took between thirty and ninety minutes, as compared to an average meal shift of six hours.  (See, e.g., Chhab Tr. at 155:2-7; White Tr. at 152:9-18; Beng Tr. at 50:24-51:1, 55:15-23; Oliver Tr. at 56:16-18); see also Tr. at 11:12-12:4.  They claim that tipped employees were required to finish their assigned opening side work tasks before the start of service, and if a tipped employee was assigned to an "easier" task, he or she would be required to assist with the more time consuming duties.  (See Chhab Tr. at 131:9-17; White Tr. at 154:8-21; Beng Tr. at 50:24-51:1; Oliver Tr. at 56:16-18.)  Similarly, plaintiffs were not allowed to leave following

their shift until all closing tasks were completed and the next meal service had been set up. (See Beng Tr. at 55:15-23.)

Plaintiffs further claim that defendants failed to monitor the amount of time tipped employees spent performing side work at the opening and close of each service, thereby perpetrating a common policy of permitting side work to exceed twenty percent of their shifts. (See Chhab Tr. at 131:9-17, 155:2-23; Beng Tr. at 55:15-23; see also Wirnowski Tr. at 20:8-24 (alleging that defendants had the ability to record time spent by tipped employees performing side work).)

### 2. Post-November 2011 TCG Side Work

In November 2011, Darden introduced its Universal Side Work program, which standardized and memorialized the required opening, running, and closing side work tasks to be completed at all TCG locations across the U.S. (Universal Side Work Edge Training Guide, Fitapelli Decl. Ex. KK.)  Plaintiffs claim that the introduction of the program reflects defendants' concession that previous side work policies had resulted in tipped employees spending more than twenty percent of their shifts performing side work. (Pl. Mem. at 12.)

Although Universal Side Work redistributed certain tasks, such as lemon wedges and butter, to non-tipped employees, it required tipped employees to perform new tasks, such as "backwashing" espresso machines and running trays through the

dishwasher.  (Universal Side Work Edge Training Guide, Fitapelli Decl. Ex. KK, at D000918.)  Plaintiffs have testified that the program neither reduced the amount of time tipped employees spent performing side work (see Mitchell Tr. at 132:1-8; Deposition of Rebecca Ledwell, Fitapelli Decl. Ex. JJ ("Ledwell Tr."), at 451:4-17), nor required MPs or any other Darden or TCG employee to monitor the time spent performing such work (see Foye Tr. at 115:13-116:20; Dickstein Tr. at 190:14-191:5; Zemlock Tr. at 214:2-19; Hamilton Tr. at 117:19-119:4.).  As a result, plaintiffs allege that defendants' policy of utilizing tipped employees to perform a substantial amount of non-tip producing side work, while being paid less than full minimum wage, continued even after the November 2011 introduction of Universal Side Work.  (See Pl. Reply Mem. at 1.)

### B. Tip Pooling

The FLSA permits the pooling of tips so long as the tip pool includes only "employees who customarily and regularly receive tips."  29 U.S.C. §§ 203(m), (t); see 29 C.F.R. § 531.54; see also Gillian v. Starjem Restaurant Corp., No. 10 Civ. 6056 (JSR), 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011) ("When all tips are received and retained by the employee, the pool only includes employees who 'customarily and regularly receive tips,' and employees are notified that the employer is taking the tip credit, the requirements of the FLSA are

satisfied and the employer is permitted to take a tip credit against minimum wage that would permit it to pay tipped employees an hourly rate lower than the standard minimum wage."). The inclusion of an employee who does not customarily and regularly receive tips will invalidate the tip credit applied to participating employees' wages. See Delaney v. Geisha NYC, LLC, 261 F.R.D. 55, 58 (S.D.N.Y. Sept. 22, 2009) ("If the tip pool includes employees who do not customarily and regularly receive tips, the employer must pay them the full minimum wage."); Chung v. New Silver Palace Rest., Inc., 246 F. Supp. 2d 220, 230-31 (S.D.N.Y. 2002).

When deciding whether an employee customarily and regularly receives tips, courts must determine whether the employee's job is historically a tipped occupation and whether he has more than "de minimis" interaction with customers as a part of his employment. See, e.g., Hai Ming Lu v. Jing Fong Rest. Inc., 503 F. Supp. 2d 706, 712 (S.D.N.Y. 2007); Garcia v. La Revise Assocs. LLC, No.08 Civ. 9356 (LTS), 2011 WL 135009, at *5 (S.D.N.Y. Jan. 13, 2011); Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048 (GEL), 2006 WL 851749, at *14 n.22 (S.D.N.Y. Mar. 30, 2006). Courts in this District have concluded that certain back-of-the-house restaurant staff, including cooks and dishwashers, cannot participate in valid tip pools under the FLSA because they do not interact with customers. See, e.g.,

Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 240 (2d Cir. 2011) (observing that a "salad maker" was not a tipped employee because he had no "direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work") (citing Myers v. Cooper Cellar Corp., 192 F.3d 546, 550-51 (6th Cir. 1999); Hai Ming Lu, 503 F. Supp. 2d at 711 (denying summary judgment due to remaining issue of fact regarding "whether pantry workers and dim sum servers . . . are . . . entitled to share in the tip pool, or, in the alternative, whether they are 'like dishwashers, cooks, or off-hour employees like an overnight janitor [who] do not directly relate with customers at all' and who may not share in the pool") (citing Kilgore v. Outback Steakhouse, 160 F.3d 294, 301 (6th Cir. 1998)). However, employees who provide direct services to customers, such as servers, hosts, and busboys, are valid tip pool participants. See 29 C.F.R. § 531.54; see also Kilgore, 160 F.3d at 301-02; Garcia, 2011 WL 135009, at *7.

Plaintiffs assert that because employees who did not customarily and regularly receive tips shared in the tip pool at TCG locations, defendants improperly took advantage of the tip credit and paid them less than minimum wage. (See Pl. Mem. at 14.) Plaintiffs only assert their tip pooling allegations for

the period before November 2011, when Darden implemented a uniform tip sharing policy in all TCG locations nationwide.

### 1. Pre-November 2011 Tip Pooling

Under a typical tip-pooling arrangement, a restaurant collects its employees' tips and then redistributes them in shares among tipped employees to equalize their incomes. Here, plaintiffs allege that while certified trainers informed tipped employees that tip pooling was mandatory, they did not themselves redistribute the tips among non-tipped employees. Rather, plaintiffs assert that the trainers instructed the tipped employees to themselves "tip out," or give a portion of their individual tips, to certain non-tipped TCG employees, including dishwashers and silverware polishers. (See Foye Tr. at 66:5-13; Rella Tr. at 43:6-444:16; Oliver Tr. at 18:7-19:16, 109:18-19; Duke Tr. at 182:4-16; White Tr. at 75:9-12; Ledwell Tr. at 393:12-24; Beng Tr. at 81:22-82:3; Smith Decl. ¶ 10). They allege that non-tip-eligible employees thus participated in the tip pools at the following locations: New York-42nd Street, New York-Wall Street, Fort Lauderdale, Florida, Orlando, Florida, Tampa, Florida, Indianapolis, Indiana, Charlotte, North Carolina, Phoenix, Ariznoa, and Pittsburgh, Pennsylvania. (See Pl. Mem. at 13 & nn.69-76.)

Plaintiffs further point to a series of emails sent by a Darden DO to several MPs in late 2010 instructing them to remove

silverware polishers from the tip pools and ensure that such employees were not receiving tips which, they contend, indicates defendants' awareness of the violation. (See Email from Paula Thomas, Fitapelli Decl. LL, at 1.) Nevertheless, plaintiffs have testified that no follow up was conducted. (See, e.g., Foye Tr. at 112:1-21.)

### 2. Post-November 2011 Tip Pooling

Simultaneous with the introduction of Universal Side Work, Darden rolled out a Standardized "One Best Way" Tip Share program, to be implemented at all TCG locations across the U.S. (See Standardized "One Best Way" Tip Share Program Rollout Guide, The Capital Grille, Fitapelli Decl. Ex. R.) That program provided, inter alia, that only servers, bartenders, bar servers, runners, bar backs, and service assistants could participate in valid tip pools. (See id. at 5.) Thus, according to plaintiffs, defendants only violated the FLSA as a result of their tip-sharing policies prior to November 2011. See Tr. at 29 ("After the rollout of the new tip share, what we have determined is that the ineligible employees were effectively removed from the tip pool.").

### C. Off-the-Clock Hours

Plaintiffs allege, and defendants do not dispute, that all TCG locations nationwide use the same standardized timekeeping system, DASH, which keeps track of the employees scheduled to

work during any given shift and the number of hours worked by each employee. (See Pl. Mem. at 15.) Nor do defendants dispute that all TCG locations adhere to Darden's "Safe and Secure" program, which requires "[a]t least one Manager and two other employees . . . [to] be in the restaurant at all times . . . at opening and closing." (The Capital Grille Recommitment 2011-2012, Fitapelli Ex. MM, at 11.)

As a result of the above policies, plaintiffs allege that defendants regularly denied tipped employees compensation by preventing them from being "on the clock" for the full amount of time spent working. (See Pl. Mem. at 14-15.) For example, tipped employees have testified that the DASH system prohibits them from clocking in more than five minutes before the official start of their shifts, or remaining clocked in between the lunch and dinner shifts, no matter how long the employees have been working before or in between shifts. (See, e.g., Wirnowski Tr. at 26:22-27:9; Boreland Tr. at 112:13-113:15; Deposition of John Mirabal, Fitapelli Decl. Ex. PP ("Mirabal Tr."), at 204:1-12.) Plaintiffs also allege that DASH prohibits them from clocking in if they are not listed on the schedule, either because they are substituting for the scheduled employee or because they picked up the shift after the schedule was entered. Since only MPs – who plaintiffs submit are disincentivized from permitting

17

employees to work in excess of forty hours per week[5] - are authorized to make adjustments to the DASH schedule, plaintiffs claim that they were regularly denied compensation for these unrecorded shifts. (See, e.g., Foye Tr. at 151:8-16; Wirnowski Tr. at 25:12-19, 26:22-27:9; White Tr. at 238:7-239:1; Rella Tr. at 76:6-24; Oliver Tr. at 39:19-40:21.)

Next, plaintiffs allege that the "Safe and Secure" program regularly requires tipped employees to be at TCG for an uncompensated period of time while closing the restaurant each night. Specifically, they claim that in order for the MPs to run the end of night report, the tipped employees who have remained at TCG pursuant to the "Safe and Secure" policy must clock out. As such, the program requires tipped employees to wait off the clock while MPs complete their closing responsibilities. (See, e.g., Chhab Tr. at 97:14-24, 100:17-22; Oliver Tr. at 101:4-20; Mitchell Tr. at 81:2-16; Ledwell Tr. at 128:5-129:20.) Plaintiffs further argue that the off the clock

---

[5] Plaintiffs have alleged that TCG MPs receive bonus compensation in amounts tied in part to the total labor hours worked by their tipped employees. (See Foye Tr. at 204:24-206:17.) They claim that MPs were reluctant to permit tipped employees to clock in for extra shifts – even if the employees in fact worked during those shifts - when they were approaching forty hours for that week. (See White Tr. at 227:2-20; Oliver Tr. at 33:4-13.) Thus, to reduce total labor hours, plaintiffs contend that MPs effectively required tipped employees to choose between working an overtime shift on the clock, but having future scheduled shifts taken away once they surpassed forty hours, or working the same shift off the clock, but retaining any tips earned during that shift. See Tr. at 41:15-42:7 ("The policy, again, is don't go into overtime. If they're losing hours, if they're screaming for these hours, they get taken from the next week. So you may gain a couple of hours here, but you're going to lose a shift in the following week. That's what the testimony reflects.").

time was "significant" due to the length of time it takes to run the end of night report and complete various forms of closing paperwork. Tr. at 38:2-5; (see Pl. Mem. at 14; Foye Tr. at 158:3-8; Email from Joe Rossi, Fitapelli Decl. Ex. NN, at 1 (recalling clocking out before having to complete weekly sales accountings and compile credit card receipts and server check out reports after closing shift); October 24, 2011 Email from Ron Adelman to MPs, Fitapelli Decl. Ex. OO, at 1 ("There should not be more than a 5 minute variance from the time the last team member clocks until the closing manager runs end of day. Team members can not being [sic] waiting for managers to close the restaurant off the clock!").)

**D. Denial of Overtime Pay**

Finally, plaintiffs allege that defendants regularly denied tipped employees overtime wages when they worked more than forty hours per week. (Pl. Mem. at 15-16); see 29 U.S.C. § 207(a)(1). Largely, plaintiffs claim that this was perpetrated through defendants' "de facto policy" against overtime, as enforced by MPs who prohibited tipped employees from working on the clock in excess of forty hours per week (see White Tr. at 227:2-20; Oliver Tr. at 33:4-13) and permitted them to work off the clock hours and shifts (see Chhab Tr. at 205:21-206:1; Benzion Tr. at 125:5-17; Rella Tr. at 85:15-86:14).

In addition, due to defendants' alleged failure to satisfy the requirements by which they can avail themselves of the FLSA tip credit, plaintiffs claim that the overtime rates paid to tipped employees are inaccurate because they are not calculated at time and one half the full statutory minimum wage. (See Pl. Mem. at 16.)

## II.  Procedural History

Plaintiffs filed their complaint on November 17, 2011, and an amended complaint on March 1, 2012, alleging that defendants had perpetrated the above willful FLSA violations through a common policy or plan with respect to all tipped employees at the forty-seven TCG restaurants nationwide. (Amended Compl., Fitapelli Decl. Ex. A.)  Defendants joined issue on April 30, 2012.  The parties have since engaged in limited discovery regarding common policies.  To date, forty-five tipped employees representing eleven TCG locations[6] have opted into the instant action.

On October 25, 2012, plaintiffs moved for conditional class certification pursuant to 29 U.S.C. § 216(b).  Defendants filed their opposition on December 17, 2012, and plaintiffs replied on January 16, 2013.  We held oral argument on the motion on August

---

[6] The eleven locations currently represented in this action are as follows: New York – Wall Street; New York – 42nd Street; New York – 51st Street; Charlotte, North Carolina; Fort Lauderdale, Florida; Indianapolis, Indiana; McLean, Virginia; Orlando, Florida; Pittsburgh, Pennsylvania; Phoenix, Arizona; and Tampa, Florida.

21, 2013.[7]

## DISCUSSION

## I.   Motion for Conditional Certification

### A.   Legal Standards

Section 216(b) of the FLSA authorizes an employee to maintain a collective action on behalf of himself and all "similarly situated" employees. 29 U.S.C. § 216(b). Unlike a class action brought under Rule 23 of the Federal Rules of Civil Procedure, a collective action requires "similarly situated" employees to affirmatively opt-in to the litigation by filing written consent forms with the court. Id. "[D]istrict courts have discretion, in appropriate cases, to implement [Section] 216(b) by facilitating notice to potential plaintiffs of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." Myers v. Hertz Corp., 624 F.3d 537, 554 (2d Cir. 2010) (internal quotation marks and alterations omitted). In determining whether to exercise such discretion, courts in this Circuit follow a two-step test. Id. at 554-55.

The first step, at issue in this motion, is commonly referred to as conditional certification. See Guillen v. Marshalls of MA, Inc., 750 F. Supp. 2d 469, 475 (S.D.N.Y. 2010). During this stage, "the court mak[es] an initial determination

---

[7] All references herein preceded by "Tr." refer to the transcript of oral argument.

to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs." <u>Myers</u>, 624 F.3d at 555. A plaintiff's burden at this stage is minimal: he must only make a "modest factual showing" that he and the potential opt-in plaintiffs were "victims of a common policy or plan that violated the law." <u>Id.</u> (internal quotation marks omitted).

To satisfy this burden, the plaintiff must offer "substantial allegations" demonstrating a "factual nexus" between the plaintiff and the potential opt-in plaintiffs. <u>Diaz v. S & H Bondi's Dep't Store</u>, No. 10 Civ. 7676 (PGG), 2012 WL 137460, at *3 (S.D.N.Y. Jan. 18, 2012) (internal quotation marks omitted); <u>see also</u> <u>Myers</u>, 624 F.3d at 555 (stating that the plaintiff must offer more than "unsupported assertions" to satisfy its burden at the first stage) (internal quotation marks omitted). The plaintiff may adduce evidence through its own pleadings, affidavits, and declarations, <u>Raniere v. Citigroup Inc.</u>, 827 F. Supp. 2d 294, 319 (S.D.N.Y. 2011), including any hearsay statements contained therein. <u>Hernandez v. Merrill Lynch & Co.</u>, No. 11 Civ. 8472 (KBF), 2012 WL 1193836, at *3 (S.D.N.Y. Apr. 6, 2012); <u>see also</u> <u>Cunningham v. Elec. Data Sys. Corp.</u>, 754 F. Supp. 2d 638, 644 (S.D.N.Y. 2010) (noting that courts use a "relatively lenient evidentiary standard" during the first stage of the analysis) (internal quotation marks omitted).

The plaintiff's burden at the first stage is "very low." Raniere, 827 F. Supp. 2d at 319; see also Myers, 624 F.3d at 555; Lynch v. United Servs. Auto. Ass'n, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007). Importantly, the court does "not weigh the merits" of the plaintiff's underlying claims. Cunningham, 754 F. Supp. 2d at 644. Nor does the court resolve factual disputes or evaluate credibility. Id.; see also Raniere, 827 F. Supp. 2d at 324. Although "unsupported assertions" are insufficient, the Second Circuit has emphasized that the standard of proof should remain "low" because "the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist." Myers, 624 F.3d at 555 (internal quotation marks omitted); see also Amador v. Morgan Stanley, No. 11 Civ. 4326 (RJS), 2013 WL 494020, at *3 (S.D.N.Y. Feb. 7, 2013). Because the standard at the first stage is "fairly lenient," courts applying it "typically grant[] conditional certification." Malloy v. Richard Fleischman & Assocs. Inc., No. 09 Civ. 332 (CM), 2009 WL 1585979, at *2 (S.D.N.Y. June 3, 2009) (internal quotation marks omitted).

As the term conditional certification suggests, the court's determination at the first stage is only preliminary. During the second stage, which often occurs after the close of discovery, the court applies increased scrutiny to determine whether the opt-in plaintiffs are in fact "similarly situated"

23

to the named plaintiff, such that a collective action should proceed.  Myers, 624 F.3d at 555; see also Morano v. Intercontinental Capital Grp., Inc., No. 10 Civ. 2192 (KBF), 2012 WL 2952893, at *5 (S.D.N.Y. July 17, 2012) (describing the second-stage standard as "stringent") (internal quotation marks omitted).  If the court is not satisfied that the opt-in plaintiffs are similarly situated to the named plaintiffs, the court will decertify the collective action and dismiss the claims of the opt-in plaintiffs without prejudice.  See, e.g., Cohen v. Gerson Lehrman Grp., Inc., 686 F. Supp. 2d 317, 327 (S.D.N.Y. 2010); Morano, 2012 WL 2952893, at *6.

**B.  Analysis**

Based on the above allegations, plaintiffs seek conditional certification of a collective action on behalf of all tipped employees who are or were employed at TCG locations nationwide between November 17, 2008 and the entry of judgment in this case.  In response, defendants argue that plaintiffs' proposed certification should be denied because they have not established that they are similarly situated to putative collective members with respect to their side work, tip sharing, and off the clock claims.  In addition, defendants object to various aspects of plaintiffs' proposed notice and related requests.  We address each of defendants' arguments in turn.

### 1. Side Work

According to defendants, plaintiffs have not established that they are similarly situated to putative collective members with respect to their side work allegations for two reasons: first, plaintiffs fail to show TCG's use of a facially unlawful side work policy (see Def. Opp. at 19), and second, plaintiffs have not shown that there were common side work practices in existence prior to November 2011, since each TCG location had "its own unique side work policy" during that time (see id. at 18).[8]  Defendants also submit that individualized differences among tipped employees' performance of side work make it impossible for plaintiffs to show common proof. (See id. at 20-21.)  For the following reasons, the Court disagrees with each of defendants' arguments.

As an initial matter, it is undisputed that TCG locations did not adhere to any formal, written side work policy prior to the implementation of Universal Side Work in November 2011. However, plaintiffs need not show the existence of a facially unlawful formal policy in order to meet the burden required of them at the conditional certification stage. See, e.g., Winfield, 843 F. Supp. 2d at 405 ("[T]he existence of a formal policy of requiring overtime pay should not immunize the

---

[8] Defendants do not dispute that TCG's side work policies were standardized following the implementation of Universal Side Work in November 2011.

defendant where the plaintiffs have presented evidence that this policy was commonly violated in practice."). They need only show evidence of a "de facto" policy which, in practice, resulted in a pattern of FLSA violations. See id. (listing cases); Myers, 624 F.3d at 555; Amador, 2013 WL 494020, at *6-7.

Defendants concede that TCG locations adhered to certain side work practices nationwide. For example, defendants argue that "each MP understood that . . . side work assignments should not take more than 30 minutes per shift." (See Def. Opp. at 18). At oral argument, they further argued that while MPs did not record the specific amount of time spent by tipped employees on side work, they uniformly ensured that a "cushion" existed between a tipped employee's total shift hours and the likely time spent performing opening side work. See Tr. at 10:12-18. Plaintiffs do not contend that these policies themselves constitute the "common policy or plan that violated the law" that they must show for conditional certification. Myers, 624 F.3d at 555. Rather, they submit that defendants' side work policies resulted, in practice, in a pattern of FLSA violations across TCG locations. For the reasons that follow, we agree.

First, plaintiffs have adduced substantial evidence showing that Darden centrally controlled the side work performed across TCG locations even before the implementation of Universal Side Work. Its Par Pull System mandated adherence to detailed

specifications for commonly performed side work tasks, including the preparation of lemon wedges and butter ramekins. (<u>See</u> Foye Tr. at 99:24-100:1.)    Darden personally selected certified trainers to oversee the training of tipped employees in its side work practices, the format of which does not vary across TCG locations.    It also made occasional brand-wide changes to its side work specifications during the relevant period, which became effective in every TCG location nationwide. (<u>See, e.g.</u>, Email from James Nuetzi to DL-CG Regional Managers, Fitapelli Decl. Ex. CC, at 1 (requiring all TCG locations to transition to a new, standardized butter service no later than October 2010).)

Plaintiffs' evidence further indicates that there was substantial overlap in the type of side work performed by tipped employees at each location prior to November 2011. (<u>See, e.g.</u>, Foye Tr. at 87:4-8; Chhab Tr. at 128:9-23; White Tr. at 135:24-138:7; Beng Tr. at 42:10-15; Oliver Tr. at 86:16-19; Declaration of Amy Smith, Fitapelli Decl. Ex. BB ("Smith Decl."), ¶ 13.) Nearly every TCG location divided those tasks into opening, running, and closing side work, and assigned them to tipped employees by station. (<u>See</u> New York – 42nd Street Side Work Guidelines, Fitapelli Decl. Ex. T, at 6; New York – 51st Street Side Work Guidelines, Fitapelli Decl. Ex. U, at 7-8; New York – Wall Street Side Work Guidelines, Fitapelli Decl. Ex. V, at 3-4, 6-8; Indianapolis, Indiana Side Work Guidelines, Fitapelli Decl.

Ex. Y, at 2-3; Charlotte, North Carolina Side Work Guidelines, Fitapelli Decl. Ex. Z, at 7, 14; Phoeniz, Arizona Side Work Guidelines, Fitapelli Decl. Ex. AA, at 6-7.)

Based on the above, plaintiffs have submitted ample deposition testimony in support of their argument that defendants' side work practices resulted in a pattern of similar FLSA violations. For example, tipped employees from multiple TCG locations testified that they performed "significant" amounts of side work at the opening and closing of each meal service. (See Chhab Tr. at 172:4-173:21; White Tr. at 174:8-17, 183:5-18; Oliver Tr. at 69:9-16; Rella Tr. at 155:23-157:8, 160:11-161:18; Boreland Tr. at 132:12-22; Shrader Tr. at 93:7-19, 95:2-9, 97:12-98:24, 101:4-21.) Notably, several tipped employees testified that their opening side work often exceeded an hour and a half, compared to an average shift of six hours, and continued throughout their shifts. (See, e.g., Chhab Tr. at 155:2-7; White Tr. at 152:9-18; Beng Tr. at 50:24-51:1, 55:15-23; Oliver Tr. at 56:16-18; Dickstein Tr. at 190:22-191:5). Plaintiffs further testified that these violations occurred as a result of defendants' uniform failure to record or monitor the time spent on non-tip-producing side work, both before and after the implementation of Universal Side Work. (See Foye Tr. at 88:13-25; Dickstein Tr. at 190:14-191:5; Deposition of James Zemlock, Fitapelli Decl. Ex. J ("Zemlock Tr."), at 214:2-19;

Deposition of James Hamilton, Fitapelli Decl. Ex. P ("Hamilton Tr."), at 117:19-119:4.)

To rebut plaintiffs' showing, defendants urge the Court to consider a number of competing declarations which they assert undermine the contention that tipped employees uniformly performed side work in excess of twenty percent of their workweeks. (See Def. Opp. at 19 & n.79.) Doing so, however, would require the Court to evaluate credibility and determine the facts. Such rulings are inappropriate at this stage. Raniere, 827 F. Supp. 2d at 324; see also Cohen, 686 F. Supp. 2d at 330 (declining to "wade into a thicket of competing factual asserts at this preliminary stage"). The accuracy of the parties' competing views will be tested through discovery and may be raised before the Court on a motion to decertify the class after the close of discovery. At this stage, however, defendants' untested declarations do not undermine plaintiffs' showing. See Winfield, 843 F. Supp. 2d at 407 n.6 ("[C]ourts in this Circuit regularly conclude that [competing] declarations do not undermine the plaintiffs' showing in the first stage of the conditional certification process."); Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 368 (S.D.N.Y. 2007) (stating that, at the notice stage, "the factual variations defendants rely on do not undercut plaintiffs' allegations of common wage and overtime practices that violate the FLSA").

Finally, defendants submit that conditional certification of plaintiffs' side work allegations would require an "individualized inquiry" into the number of hours each tipped employee worked per shift as compared to the number of hours those employees spent on non-tip-producing side work. (See Def. Opp. at 20-21.)   To support that argument, defendants rely solely on the reasoning espoused in Strait v. Belcan Engineering Grp., Inc., 911 F. Supp. 2d 709 (N.D. Ill. 2012), in which the U.S. District Court for the Northern District of Illinois concluded that conditional class certification was not warranted where liability is potentially dependent on a number of individualized factual assessments regarding potential plaintiffs' employment duties.  See id. at 723.  Beyond the non-binding nature of that precedent on the resolution of this motion, we note that courts in this District have rejected such arguments.  See Cohen v. Gerson Lehrman Grp., Inc., 686 F. Supp. 2d 317, 329 (S.D.N.Y. 2010); Francis v. A & E Stores, Inc., 2008 WL 4619858, at *3 & n.3 (S.D.N.Y. Oct. 16, 2008) (concluding that it "seem[s] to be against the weight of authority in undertaking that analysis at the first stage of the certification process, rather than evaluating at the decertification stage whether the need for individual analysis makes a collective action inappropriate").  We find defendants' argument more appropriately addressed at a damages phase should

the case reach that point.   Accordingly, we believe it is premature for the Court to conclude at this stage that plaintiffs' experiences were so individualized as to defeat their motion for conditional certification.

In sum, none of defendants' arguments refute plaintiffs' showing that they are similarly situated to putative collective members with respect to their side work allegations.

### 2. Tip Pooling

Defendants next argue that plaintiffs are not similarly situated to putative collective members with respect to their tip pooling claims because they establish neither the existence of a common policy or practice regarding tip sharing prior to November 2011, nor that ineligible employees received tips "at <u>all</u> locations, and <u>at the direction of management</u>." (<u>See</u> Def. Opp. at 16.)

Once again, plaintiffs do not assert the existence of a formal, chain-wide tip pooling policy prior to November 2011. However, they have adduced considerable evidence indicating that common tip sharing practices across TCG locations resulted in a pattern of FLSA violations.   Testimony from putative collective members confirms that MPs instructed tipped employees to "tip out," or give a portion of their individual tips, to tip-ineligible employees. (<u>See</u> Foye Tr. at 66:5-13; Rella Tr. at 43:6-444:16; Oliver Tr. at 18:7-19:16, 109:18-19; Duke Tr. at

182:4-16; White Tr. at 75:9-12; Ledwell Tr. at 393:12-24; Beng Tr. at 81:22-82:3; Smith Decl. ¶ 10.) Moreover, Brian Foye, the former Senior Vice President of Operations at TCG, has testified that such tip pooling practices were implemented by Darden's certified trainers, although they were perpetuated by generations of MPs without further training. (See Foye Tr. at 66:5-13.)

Plaintiffs have established that silverware polishers and dishwashers were tip-ineligible employees because they do not interact with customers at TCG, as their primary responsibility was to clean flatware and glasses in the kitchen area, away from table service. (See, e.g., Chhab Tr. at 243:23-25; White Tr. at 183:3-13; Oliver Tr. at 109:10-17; Ledwell Tr. at 438:6-10.) They have further submitted evidence indicating that tip pools included silverware polishers and dishwashers in at least nine TCG locations: New York-42nd Street, New York-Wall Street, Fort Lauderdale, Florida, Orlando, Florida, Tampa, Florida, Indianapolis, Indiana, Charlotte, North Carolina, Phoenix, Arizona, and Pittsburgh, Pennsylvania. (See Rella Tr. at 43:6-44:16; Oliver Tr. at 109:18-19; Duke Tr. at 182:4-16; White Tr. at 75:9-12; Ledwell Tr. at 393:12-24; Beng Tr. at 81:22-82:3; see also Foye Tr. at 106:25-108:7 (confirming that silverware polishers were included in the tip pool at the Boca Raton, Florida location.) Thus, plaintiffs have made the minimal

factual showing required of them that there was a common practice of requiring tipped employees to share tips with non-eligible employees in multiple TCG locations.

In response, defendants submit that any common practice of "tipping out" tip-ineligible employees was voluntary on the part of the tipped employees. (See Def. Opp. at 17 & n.71.) We note that defendants have failed to support their argument with documentary evidence or deposition testimony, and find that the emails sent by Darden management, instructing MPs to root out and eradicate any such practices, further undermine that contention. (See Fitapelli Decl. LL, at 1.) To the contrary, plaintiffs have adduced substantial testimonial evidence showing that the practice of "tipping out" to non-tipped employees was not voluntary, but rather was represented to them as reflecting mandatory TCG policy.[9] (See Foye Tr. at 66:5-13; Rella Tr. at 43:6-444:16; Oliver Tr. at 18:7-19:16, 109:18-19; Duke Tr. at 182:4-16; White Tr. at 75:9-12; Ledwell Tr. at 393:12-24; Beng Tr. at 81:22-82:3; Smith Decl. ¶ 10.) Thus, defendants' competing factual assertion neither overcomes plaintiffs' showing of being similarly situated with respect to tip pooling,

---

[9] As a result, defendants' reliance on <u>Turner v. Millennium Park Joint Venture, LLC</u>, 767 F. Supp. 2d 951 (N.D. Ill. 2011), is inapposite. There, the court permitted silverware rollers to participate in a valid tip pool because it had been conclusively established that the tipped employees voluntarily agreed to include them. <u>Id.</u> at 954.

nor deserves this Court's consideration at the conditional certification stage.[10]

### 3. Off-the-Clock Hours and Denial of Overtime Pay

Defendants next argue that plaintiffs have not made the requisite factual showing that they were victims of a common policy requiring them and other putative collective members to work off the clock because TCG's time-recording and Safe and Secure policies were facially lawful, and plaintiffs have not shown that those policies led to common deviations which resulted in FLSA violations. (See Def. Opp. at 12-14.) Again, we disagree with defendants' assertions.

As stated above, plaintiffs' off the clock allegations need not allege the existence of a facially unlawful common policy. Plaintiffs' declarations sufficiently establish Darden's control over the timekeeping policies and procedures implemented at TCG locations nationwide, as it is undisputed that all tipped employees were required to log into Darden's centralized DASH network to clock in or out, request time off, or access payroll information. (See Darden Team Member Handbook, Benson Decl. Ex. 10, at 31.) It is also undisputed that only MPs possessed the

---

[10] We further point out defendants' incorrect legal assertion that there is "nothing unlawful about . . . tip-sharing in the first instance if it was voluntary." Tr. at 27:21-22. To the contrary, defendants are prohibited from taking advantage of the FLSA's tip credit with respect to tipped-employees who participate in a tip pool, voluntary or not, when that pool includes employees who do not customarily and regularly receive tips as a part of their employment. See 29 U.S.C. §§ 203(m), 203(1); Chung, 246 F. Supp. 2d at 228-30; Garcia, 2011 WL 135009, at *6-7.

requisite authorization to make changes to the shift schedule and authorize overtime hours in the DASH system. (Id.) Darden further mandated the implementation of the Safe and Secure policy in all TCG locations nationwide. (See The Capital Grille Recommitment 2011-2012, Fitapelli Ex. MM, at 11.)

Although they concede that the above policies were facially lawful, plaintiffs have presented significant evidence that they resulted, in practice, in a pattern of FLSA violations across TCG locations. With respect to their off the clock claims, they establish that MPs refused to adjust tipped employees' scheduled shifts or record overtime hours in the DASH system, which requires MPs' authorization to effect such changes, in order to keep labor hours low. (See Foye Tr. at 151:8-16; Wirnowski Tr. at 25:12-19, 26:22-27:9; White Tr. at 238:7-239:1; Rella Tr. at 76:6-24; Oliver Tr. at 39:19-40:21; Boreland Tr. at 112:13-113:15; Mirabal Tr. at 204:1-12.) With respect to the Safe and Secure policy, at least four putative collective members have testified that they were required to wait off the clock while their MPs ran the end of night report. (See Chhab Tr. at 97:14-24; Oliver Tr. at 101:4-20; Mitchell Tr. at 81:2-16; Ledwell Tr. at 128:5-129:20.) Foye, the former Senior Vice President of Operations at TCG, further testified that he was aware of incidents of off the clock waiting resulting from adherence to Safe and Secure, that he spoke to the DOs who reported to him to

35

ask them to follow up, and that in one instance he terminated an MP who continued to take a significant amount of time to close up after employees clocked out. (See Foye Tr. at 158:3-25.) Thus, we find that plaintiffs' declarations and supporting testimony support their contention that the operation of TCG's lawful policies could have resulted in common violations.

To rebut the above allegations, defendants rely primarily on alternative declarations from other putative collective members who attest that they were not uniformly required to wait off the clock due to Safe and Secure, but as we stated supra, at this stage such competing declarations are insufficient to undermine plaintiffs' showing. See Winfield, 843 F. Supp. 2d at 407 n.6; Cohen, 686 F. Supp. 2d at 329; In re Penthouse Exec. Club Compensation Litig., 2010 WL 4340255, at *4. As a result, we conclude that plaintiffs have met their minimal burden with respect to their off the clock and overtime allegations.

### C.   Conclusion

For the foregoing reasons, the Court authorizes the distribution of notice to all tipped employees who work or have worked at any of the forty-seven U.S. locations of TCG.

## II.   Notice to Potential Opt-In Plaintiffs

### A.   Legal Standards

Upon authorizing the distribution of notice to potential opt-in plaintiffs, the district court maintains "broad

discretion" over the form and content of the notice.  Gjurovich v. Emmanuels Marketplace, Inc., 282 F. Supp. 2d 101, 106 (S.D.N.Y 2003) (citing Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989)).  In exercising this discretion, the court should be "guided by the goals of the notice:  to make as many potential plaintiffs as possible aware of this action and their right to opt in without devolving into a fishing expedition or imposing undue burdens on the defendants."  Guzelgurgenli, 2012 WL 3264314, at *13 (internal quotation marks omitted).

B.  **Analysis**

Plaintiffs request that the Court approve their proposed notice of lawsuit, opt-in consent form, and deadline reminder letter.  (Fitapelli Decl., Exs. R, S, T.)  Defendants contend that plaintiffs' proposed materials are deficient in a number of respects.  We consider defendants' objections seriatim.

1.  **Recipients**

With respect to defendants' first objection, we note that, because the three-year statute of limitations period for willful FLSA violations runs for each individual plaintiff until that plaintiff consents to join the action, notice should generally be directed to those employed within three years of the date of the Order granting conditional certification or to the mailing of the notice.  See 29 U.S.C. § 255; Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F. Supp. 2d 445, 451 (S.D.N.Y. 2011); In

re Penthouse Exec. Club Compensation Litig., No. 10 Civ. 1145 (NRB), 2010 WL 4340255, at *5 n.4 (S.D.N.Y. Oct. 27, 2010). However, plaintiffs seek to toll the statute of limitations in order to provide court-authorized notice to all tipped employees who work or have worked at TCG since November 17, 2008, three years before the filing of the complaint in this action.

When faced with a request for equitable tolling of the notice period, some courts in this district have permitted plaintiffs to send notice to similarly situated persons employed within three years of the filing of the complaint, "with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date." Winfield v. Citibank, N.A., 843 F. Supp. 2d 397, 410 (S.D.N.Y. 2012) (quoting Whitehorn, 767 F. Supp. 2d at 451); see also Thompson v. World Alliance Fin. Corp., No. 08 Civ. 4951, 2010 WL 3394188, at *7 (E.D.N.Y. Aug. 20, 2010). Generally, we are not comfortable with the reasoning offered in support of granting defendants leave to challenge the timeliness of individual plaintiffs' claims at some later date. It would severely undermine the provision of a three-year maximum statute of limitations if courts were prepared to readily widen that period to span four or five years simply because some litigation ensued in the interim. Nevertheless, we agree with plaintiffs' argument that, absent tolling, defendants would be perversely

incentivized to drag out preliminary discovery so as to shorten the pre-filing notice period. Moreover, given the unique timing of events in this case, particularly defendants' implementation of certain uniform policies to address potential FLSA violations just days before the filing of plaintiffs' complaint, denying plaintiffs the tolling they seek would exclude a large chunk of time during which defendants were potentially violating the FLSA, and include instead the period during which they were making attempts to comply.

Thus, we conclude that notice should be sent to all tipped employees who work or have worked at TCG since November 17, 2008. Defendants are free to challenge the timeliness of individual plaintiffs' claims in the future.

### 2. Notice Period

Plaintiffs' proposed notice and consent form provide a 90-day notice period. Defendants contend that a 60-day notice period is sufficient. The Court agrees. See, e.g., Diaz, 2012 WL 137460, at *8 (noting that "[m]any courts in this district have set a 60-day period," and that longer periods are warranted "on consent or where special circumstances indicate that an extended opt-in period is appropriate").

Accordingly, the notice and consent form shall require opt-in plaintiffs to consent to join the collective action within 60 days of the notice mailing date.

### 3. Form of Notice

Defendants object to various aspects of plaintiffs' proposed form of notice. Specifically, they contend such notice is improper because it uses larger font, bold typeface, and underlining to highlight the language that promotes joining the lawsuit. (See Def. Opp. at 24.) We agree with defendants that such emphasis is promotional and improper. All language in the notice is important and should be equally emphasized.

Defendants further object to the portion of plaintiffs' proposed notice which directs potential collective members to contact only plaintiffs' counsel with questions. Instead, defendants contend that both plaintiffs' and defendants' counsel's information should be made available to permit both parties to act as a source of information. (See Def. Opp. at 24-25.) We disagree. Only plaintiffs' counsel can potentially represent the individuals to whom the notice is mailed, and only they should be privy to certain sensitive information that may otherwise fall within the attorney-client privilege. Thus, it is appropriate that defendants' counsel not be listed as contacts on the form of notice.

### 4. Reminder Notice

Plaintiffs propose the distribution of a "reminder" notice prior to the expiration of the opt-in period to alert potential plaintiffs that the deadline is coming due. Plaintiffs contend

that a reminder notice promotes the broad remedial purpose of the FLSA. In response, defendants characterize the proposed notice as an endorsement by the Court for putative collective members to join the lawsuit. (Def. Opp. at 25.) They ask the Court to deny plaintiffs' request in its entirety. We decline to do so.

Both parties cite case law either authorizing or rejecting the issuance of a reminder notice. Compare Guzelgurgenli, 2012 WL 3264314, at *15-16 (denying plaintiffs' request to distribute a reminder notice when plaintiffs did "not identif[y] any reason why a reminder notice [wa]s necessary"), with Morris v. Lettire Constr. Corp., 896 F. Supp. 2d 265, 281 (S.D.N.Y. 2012) (authorizing reminder notice to promote broad remedial purpose of FLSA). Given that notice under the FLSA is intended to inform as many potential plaintiffs as possible of the collective action and their right to opt-in, we find that a reminder notice is appropriate. Lettire, 896 F. Supp. 2d at 281; Raniere, 827 F. Supp. 2d at 327; accord Harris v. Vector Mktg. Corp., 716 F. Supp. 2d 835, 847 (N.D. Cal. 2010).

### 5. Posting of Notice

Finally, defendants oppose plaintiffs' request to post the approved form of notice in a conspicuous location at all TCG locations, arguing that such posting is unnecessary where defendants provide sufficient contact information for potential

collective members.  (See Def. Opp. at 24.)  Based on applicable precedent within this District, we agree and deny plaintiffs' request to post notice.  See Amador, 2013 WL 494020, at *7 (concluding that posting notice at potential plaintiffs' work locations is unnecessary when the form of notice is mailed to potential plaintiffs).

## III. Disclosure Request

Finally, plaintiffs seek expedited disclosure by defendants of the names, work locations, dates of employment, last known addresses, phone numbers, and email addresses of all potential plaintiffs to the collective action in order to send them the proposed notice and consent form.  Numerous courts have found that discovery of such information is appropriate, see Raniere, 827 F. Supp. 2d at 327 (collecting cases), and defendants do not oppose this request.  However, defendants do object to the provision of email addresses and telephone numbers, both because they do not maintain such records for past employees and because providing such disclosures may encourage plaintiffs' counsel to harass potential collective members.  (See Def. Opp. at 25.) While we are unwilling to adopt defendants' suggestion that plaintiffs' counsel would engage in harassing behavior, nonetheless we agree with defendants' proposed limitation on disclosure of data concerning potential class members.  Thereby we order defendants to produce the names, work locations, dates

of employment, and last known addresses for all tipped employees who work or have worked at TCG since November 18, 2007 to plaintiffs' counsel by October 4, 2013.

### CONCLUSION

For the foregoing reasons, the motion (dkt. no. 71) is granted in part and denied in part.


Dated:     New York, New York
           September 19, 2013


NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

43

Copies of the foregoing Order have been mailed on this date to the following:

**Attorneys for Plaintiffs**
Joseph A. Fitapelli, Esq.
Brian S. Schaffer, Esq.
Eric J. Gittig, Esq.
Fitapelli & Schaffer, LLP
475 Park Avenue South, 12th Floor
New York, NY 10016

Louis Pechman, Esq.
N. Marely Mercado, Esq.
Berke-Weiss & Pechman LLP
488 Madison Avenue, 11th Floor
New York, NY 10022

D. Maimon Kirschenbaum, Esq.
Matthew D. Kadushin, Esq.
Joseph, Herzfeld, Hester & Kirschenbaum, LLP
233 Broadway, 5th Floor
New York, NY 10279

**Attorneys for Defendants**
Craig R. Benson, Esq.
George Pauta, Esq.
Sarah E. Moss, Esq.
Lauren Schwartzreich, Esq.
Littler Mendelsohn, P.C.
900 Third Avenue
New York, NY 10022

Gerald L. Maatman, Jr., Esq.
Seyfarth Shaw LLP
131 South Dearborn Street, Suite 2400
Chicago, IL 60603-5577